## AMENDMENT ENDORSEMENT

To be attached to and form part of Policy Number:  **SUA 12139**

In favor of:  **NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC., NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING SYSTEMS, INC.**

In consideration of the premium paid, it is hereby understood and agreed that the, **DECLARATIONS PAGE "5 SPECIAL CONDITIONS" AND SECOND DECLARATIONS PAGE "ITEM 9"** are amended to read as follows:

A1, A2, A6, A7, A8, A9, A12, A13, A14, A15, A17, A21, A80, A46

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

The effective date of this endorsement is November 30, 2009.


A80    AMEND 1

## ENDORSEMENT

To be attached to and form a part of Policy Number: **SUA 12139**

In favor of: **NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC., NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING SYSTEMS, INC.**

In consideration of the premium charged, it is hereby understood and agreed that Item 1. A. "Insured's Profession" of the Secondary Declarations Page of this Mortgage Company Professional Policy is deleted in its entirety and replaced with the following:

Item 1.   A. Insured's Profession:  <u>LOAN SERVICER/ESCROW AGENT/PAYMENT PROCESSOR</u>

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

The effective date of this endorsement is November 30, 2009

A46

**This Declaration Page is attached to and forms part of certificate provisions (Form SLC-3 USA).**

| Previous No. | Authority Ref. No. | Certificate No. |
|---|---|---|
| SUA 11866 | PFDO10409 | SUA 12139 |

1 Name and Address
of the Assured

     **NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC.,
NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND
NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING
SYSTEMS, INC.
1001 PACIFIC AVENUE, SUITE 200
TACOMA, WA 98402**

2 Effective from November 30, 2009      to November 30, 2010
both days at 12:01 a.m. Standard Time

3 Insurance is effective with certain companies      Percentage
**UNDERWRITERS AT LLOYD'S, LONDON**      **100%**

| 4 Amount | Coverage | Rate | Premium |
|---|---|---|---|
| $3,000,000 (See Policy for any applicable sub-limits) | Mortgage Company Professional Liability | | $35,700.00 |
| | | Policy Preparation Fee | $125.00 |

5 Special Conditions

  A1, A2, A6, A7, A8, A9, A12, A13, A14, A15, A17, A21

6 Service of Suit may be made upon: (See Service of Suit Endorsement)

Dated                    Stateside Underwriting Agency, Inc.

November 30, 2009         by _____
                                  Correspondent

## PROFESSIONAL SERVICES LIABILITY POLICY

**THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  CLAIMS EXPENSES REDUCE AND MAY EXHAUST THE COVERAGE LIMITS, AND ARE SUBJECT TO THE RETENTION.**

SUA 12139
**POLICY NUMBER**

### UNDERWRITERS AT LLOYD'S, LONDON

## DECLARATIONS

**Item 1.**     Name and Address of Insured:

NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC., NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING SYSTEMS, INC.
1001 PACIFIC AVENUE, SUITE 200
TACOMA, WA 98402

**A.** Insured's Profession:  ESCROW AGENT/MORTGAGE LOAN SERVICER/PAYMENT PROCESSOR FOR MORTGAGE LOANS

**Item 2.**     Policy Period     (Month     Day     Year)
From:   November 30, 2009          To:  November 30, 2010
12:01 A.M. Local Time at the Address of the Organization as stated in Item 1 above.

**Item 3.**     Limit of Liability (Inclusive of Defense Costs):
$3,000,000          Aggregate for each Policy Period

**Item 4.**     Retention:  $25,000          each Claim

**Item 5.**     The Premium for this Policy is:  $35,700.00

**Item 6.**     Retroactive Date:  November 30, 2007

**Item 7.**     Coverage Date:  **November 30, 2007**

**Item 8.**     Notice Pursuant to Article VI:     Clausen Miller PC
                                                 10 South LaSalle Street
                                                 Chicago, IL 60603-1098

**Item 9.**     Endorsements Attached at Issuance:
A1, A2, A6, A7, A8, A9, A12, A13, A14, A15, A17, A21

Authorized Representative: _____          November 30, 2009
                                          Signature                                         Date

# PROFESSIONAL SERVICES LIABILITY POLICY

**THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD.  CLAIMS EXPENSES REDUCE AND MAY EXHAUST THE COVERAGE LIMITS, AND ARE SUBJECT TO THE RETENTION.**

In consideration of the payment of the premium, reliance by the Company upon the statements made to the Company in the application attached hereto and made a part hereof, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the Company agrees with the **INSURED** as follows:

## I.	INSURING AGREEMENT

The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

## II.	DEFENSE AND SETTLEMENT

Subject to Article V.B., the Company shall have the right and duty to defend any **CLAIM** against the **INSURED** to which this insurance applies, even if any of the allegations of the **CLAIM** are groundless, false or fraudulent.

The Company shall have the right to negotiate the settlement of any **CLAIM**, whether within or above the Retention, but the Company shall not commit the **INSURED** to any settlement without the **INSURED'S** consent, such consent not to be unreasonably withheld.  The

**INSURED** shall not admit liability for or settle any **CLAIM** or incur any **DEFENSE COSTS** without the written consent of the Company, such consent not to be unreasonably withheld.  If the **INSURED** refuses to consent to any settlement recommended by the Company and agreed to by the claimant, and elects to contest any **CLAIM** or continue any legal proceedings in connection with such **CLAIM**, then, subject to the Limit of Liability of this Policy, the Company's liability for the **CLAIM** shall be limited to the amount in excess of the Retention which the Company would have contributed to the settlement had the **INSURED** consented to such settlement plus the **DEFENSE COSTS** incurred up to the date of such refusal.

## III.    DEFINITIONS

A.    **"INSURED"** means the individual, partnership, corporation or other entity named in Item 1 of the Declarations and shall include all persons who were, are or shall become: 1) directors, officers, partners or employees of the **INSURED** while acting within the scope of their duties as such; and 2) the executors, heirs, legal representatives or assigns of each **INSURED** otherwise insured herein in the event of his or her death, incompetency, insolvency or bankruptcy.

B.    **"WRONGFUL ACT"** means any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations.

C.    **"LOSS"** means money damages, settlements, and **DEFENSE COSTS**.  **LOSS** shall not include:

1.    punitive or exemplary damages or the multiplied portion of a multiplied damages award;

SUA MCPL 2008 Ver 10.30.08                    2

2.      criminal or civil fines or penalties imposed by law;

3.      taxes;

4.      matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

D.      **"POLICY PERIOD"** means the period from the inception date of this Policy to the expiration date stated in Item 2 of the Declarations, or to any earlier cancellation date of this Policy.

E.      **"DEFENSE COSTS"** means reasonable and necessary legal fees and expenses incurred with the approval of the Company in connection with the investigation, adjustment, settlement, defense or appeal of a **CLAIM** made against an **INSURED** for a **WRONGFUL ACT**, and shall include the cost of attachment or similar bonds.  Payment of **DEFENSE COSTS** by the Company shall reduce, and may exhaust, the Limit of Liability under this Policy.

**"DEFENSE COSTS"** shall not include salaries, wages, fees, overhead, overtime or benefit expenses incurred by or associated with the **INSUREDS**.

F.      **"CLAIM"** means a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings.

G.      **"INTERRELATED WRONGFUL ACTS"** means **WRONGFUL ACTS** that have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions.

H.      **"MONEY LAUNDERING"** means:

(i)     the concealment, or disguise, or conversion, or transfer, or removal of **CRIMINAL PROPERTY** (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or

(ii)    the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of **CRIMINAL PROPERTY** by or on behalf of another person; or

(iii)   the acquisition, use or possession of **CRIMINAL PROPERTY**; or

(iv)    any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

(v)     any act which constitutes aiding, abetting, counseling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

I.     **"CRIMINAL PROPERTY"** means property which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in whole or part and whether directly or indirectly) which the **INSURED** (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit.

J.     **"CRIMINAL CONDUCT"** means conduct which constitutes (or would constitute) an offence in any part of the world.

K.     **"ACT OF TERRORISM"** means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting

alone or on behalf of or in connection with any organization(s) or government(s) committed for political, religious, ideological, or similar purposes, including the intention to influence any government and/or to put the public, or any section of the public, in fear.

## IV.   EXCLUSIONS

This Policy does not apply to **LOSS** in connection with any **CLAIM**:

A.   based upon or directly or indirectly arising out of or resulting from an **INSURED** gaining in fact any personal profit or advantage to which the **INSURED** is not legally entitled;

B.   that results in a judgment or final adjudication that any **INSURED** has committed any criminal, dishonest, intentionally malicious, or fraudulent act, error or omission.

However, any **WRONGFUL ACT** pertaining to any of the **INSUREDS** shall not be imputed to any other person for the purposes of determining the applicability of Exclusions A. and B;

C.   based upon or directly or indirectly arising out of or resulting from any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease, or death, including but not limited to loss of consortium or services, or any actual or alleged damage to or loss of or destruction of any tangible property, including loss of use thereof;

D.   brought by or on behalf of one **INSURED** under this Policy against another **INSURED** under this Policy, except where:

1.   such **CLAIM** arises out of the performance of or failure to perform professional services for the claimant **INSURED** as a client in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations; or

2.   such **CLAIM** is in the form of a cross claim, third-party claim or otherwise

for contribution or indemnity and is part of and results directly from a **CLAIM** which is not otherwise excluded by the terms of this Policy;

E.  based upon or directly or indirectly arising out of or resulting from any actual or alleged activities of an **INSURED** in a fiduciary capacity with respect to any employee benefit or pension plan, or based upon the Employee Retirement Income Security Act of 1974, any and all amendments thereto, any rule, regulation, or order issued pursuant thereto, or any similar provisions of any other federal, state or local statutory law or common law;

F.  based upon or directly or indirectly arising out of or resulting from:

   1.  any actual or alleged seepage, pollution or contamination of any kind, including but not limited to the storage, transportation, treatment, discharge, dispersal, release, emission or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic materials, chemicals, radon, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere or any watercourse or body of water, or otherwise, or

   2.  any regulation, order, direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any of the foregoing;

G.  based upon or directly or indirectly arising out of or resulting from any actual or alleged (1) false arrest, malicious prosecution, abuse of process, false detention or false imprisonment; (2) assault and battery; (3) libel, slander or defamation of character; (4) wrongful entry or eviction; or (5) invasion of any right of privacy;

H.  based upon or directly or indirectly arising out of or resulting from any actual or alleged failure or omission on the part of any **INSURED** to procure or adequately maintain insurance, suretyship, or bonds;

I.      based upon or directly or indirectly arising out of or resulting from any actual or alleged use, exposure, presence, existence, detection, removal, elimination or avoidance of asbestos, or any actual or alleged asbestos-related injury or damages;

J.      seeking relief or redress in any form other than money damages including but not limited to **CLAIM(S)** for injunctive relief in any form whatsoever and including disciplinary proceedings;

K.      based upon or directly or indirectly arising out of or resulting from the breach of an express warranty or guarantee;

L.      based upon or directly or indirectly arising out of or resulting from any actual or alleged infringement of copyright, title, slogan, patent, trademark, trade dress, service mark or service name;

M.      based upon or directly or indirectly arising out of or resulting from any actual or alleged unfair competition, interference with contract or violation of anti-trust laws;

N.      to the extent that there is coverage under any other existing valid policy or policies, whether such other insurance is stated to be contributory, excess, contingent or otherwise and regardless of whether or not such **LOSS** is collectible or recoverable under such other insurance; provided, however, that this exclusion shall not apply to any **LOSS** in excess of the retention and limit of liability of such other policy or policies where such **CLAIM** is otherwise covered under the terms of this Policy;

O.      based upon or directly or indirectly arising out of or resulting from any actual or alleged:

    1.      **WRONGFUL ACT** or matter, fact, circumstance, situation, event or

transaction that has been the subject of any claim made prior to the
inception of this Policy or of any notice given during any prior policy;

    2.    **WRONGFUL ACT** which, together with a **WRONGFUL ACT** that has
been the subject of any claim or notice identified in O.1. above, would
constitute **INTERRELATED WRONGFUL ACTS**; or

    3.    Matter, fact, circumstance, situation, event or transaction known to an
**INSURED** prior to the Coverage Date set forth in Item 7 of the
Declarations if such matter, fact or circumstance would cause a reasonable
person to believe that a **CLAIM** for a **WRONGFUL ACT** may be made;

P.    based upon or directly or indirectly arising out of or resulting from any violation of
any civil rights laws, including but not limited to discrimination by the Insured on the basis of age,
color, race, creed, sex, size, national origin or marital status;

Q.    based upon or directly or indirectly arising out of or resulting from any actual or
alleged assumption by the **INSURED** under any contract or agreement of the liability of others,
unless such liability would have attached to the **INSURED** in the absence of such contract or
agreement;

R.    based upon or directly or indirectly arising out of or resulting from any actual or
alleged:

    1.    electronic or software failure, or
    2.    failure, breakdown or malfunction of any machine or system of machines;

S.    based upon or directly or indirectly arising out of or resulting from any actual or
alleged **MONEY LAUNDERING** or any actual or alleged act which is in breach of and/or
constitutes an offence under any money laundering legislation (or any provisions and/or rules or

regulations made by any regulatory body or authority thereunder);

T.      based upon or directly or indirectly arising out of or resulting from any actual or alleged advertising or solicitation activities of an **INSURED**;

U.      based upon or directly or indirectly arising out of or resulting from any of the following, regardless of any other cause or event contributing concurrently or otherwise to the loss:

> 1.      war, invasion, acts of foreign enemies, hostilities, or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

> 2.      any **ACT OF TERRORISM**;

This exclusion applies to all **LOSS** based upon, directly or indirectly arising out of or resulting from any action taken in controlling, preventing, suppressing or in any way relating to 1. or 2. above;

V.      brought by or on behalf of any governmental authority, quasi-governmental authority or other regulatory authority or agency, except when acting in the capacity of a customer or client of the **INSURED** or on behalf of a customer or client of the **INSURED** and when such **CLAIM** arises from Professional Services rendered or that should have been rendered to such authority or customer or client;

W.      based upon or directly or indirectly arising out of or resulting from loan servicing, including (1) collecting, receiving or recording payments on mortgage loans, (2) establishing or administering tax or insurance escrow accounts on mortgage loans, (3) managing real property owned by or under the supervision or control of an Insured, or (4) performing any other acts

related to (1), (2) or (3);

X.      based upon or directly or indirectly arising out of or resulting from any actual or alleged duty to repurchase a loan;

Y.      based upon or directly or indirectly arising out of or resulting from any actual or alleged breach by an Insured of an agreement to hold harmless or indemnify an investor, purchaser or lender in connection with a loan originated, made, held or sold by an Insured as mortgage broker or mortgage banker;

Z.      based upon, arising out of or in consequence of forming, syndicating, operating, administering, advising or rolling up a limited partnership or real estate investment trust;

AA.     based upon or directly or indirectly arising out of or resulting from the depreciation (or the failure to appreciate) in value of any investment transaction, including real property, securities, commodities, currencies, options and futures, or any actual or alleged representation, advice, guarantee or warranty provided by or behalf of an Insured with regard to the performance of any such investment;

BB.     based upon or directly or indirectly arising out of or resulting from any actual or alleged (1) non-disclosure, concealment, misrepresentation, misstatement or falsification of any terms of a loan, or of any rights or information required to be disclosed or revealed under TILA; or (2) improper, excessive, illegal, or unauthorized fees, penalties or costs, including but not limited to prepayment penalties. The term "TILA" means, for purposes of this Exclusion, the Truth-in-Lending Act of 1968, Title I of the Consumer Credit Protection Act as amended (15 USC § 1601 et seq.) or Regulation Z (12 CFR Part 226);

CC.     brought against the Parent or affiliated entities of a corporation named in Item 1 of the Declarations, or brought by or on behalf of a Parent or affiliated entities of a corporation named in Item 1 of the Declarations.  The term "Parent" means, for purposes of this Exclusion, a

corporation that owns more than 50% of the voting stock of the corporation, if any, named in Item 1 of the Declarations;

DD.    based upon or directly or indirectly arising out of or resulting from any defective title or deed;

EE.    based upon or directly or indirectly arising out of or resulting from any transaction (1) involving real property in which any Insured or any affiliate of any Insured has or acquires a direct or indirect ownership or financial interest, or (2) involving a lease of property in which any Insured or any affiliate of any Insured has a direct or indirect ownership or financial interest;

FF.    based upon or directly or indirectly arising out of or resulting from the insolvency or bankruptcy of any Insured or of any other entity including but not limited to the failure, inability, or unwillingness to pay Claims, losses, or benefits due to the insolvency, liquidation or bankruptcy of any such individual or entity.

## V.    LIMIT OF LIABILITY AND RETENTION

### A.    LIMIT OF LIABILITY

The Limit of Liability stated in Item 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Company for all **LOSS** under the Policy, including **DEFENSE COSTS**, regardless of the number of **CLAIMS** made against the **INSUREDS** or the time when **LOSS** payments are made by the Company.

### B.    EXHAUSTION OF LIMIT

The Company shall not be obligated to pay any **LOSS**, including **DEFENSE COSTS**, or defend any **CLAIM** after the available Limit of Liability has been exhausted by payment of money damages, settlements or **DEFENSE COSTS**.

### C.   MULTIPLE INSUREDS, CLAIMS OR CLAIMANTS

The inclusion herein of more than one **INSURED** or the making of **CLAIM(S)** by more than one person or organization shall not operate to increase the Company's Limit of Liability. **CLAIM(S)** arising out of a single **WRONGFUL ACT**, or **INTERRELATED WRONGFUL ACTS**, shall be treated as a single **CLAIM**, and such single **CLAIM** shall be considered first made:

1.   when the earliest **CLAIM** within such single **CLAIM** was first made, or

2.   when notice was first given under any policy of insurance of any **WRONGFUL ACT** or any matter, fact, circumstance, situation, event or transaction that underlies any **CLAIM** within such single **CLAIM**,

and all such **CLAIM(S)** shall be subject to the same Limit of Liability.

### D.   RETENTION

Subject to the Limit of Liability, the Company shall only be liable for **LOSS** in excess of the Retention stated in Item 4 of the Declarations.  This Retention shall apply to each **CLAIM** made against the **INSUREDS**.  The Retention shall be borne by the **INSURED** as its own uninsured risk and shall be fully paid by the **INSURED** before Underwriters shall incur any liability to pay any **LOSS**.  The Retention applies to **DEFENSE COSTS**, whether or not any other **LOSS** is paid.

## VI.   NOTICE AND LOSS PROVISIONS

A.      As a condition precedent to the availability of the rights provided under this Policy, the **INSURED** shall give written notice to the Company of any **CLAIM** made against the **INSURED** as soon as practicable, but in no event later than sixty (60) days after the date such **CLAIM** is first made.

B.      If during the **POLICY PERIOD** or the Extended Reporting Period, if applicable, the **INSURED** shall first become aware of a specific **WRONGFUL ACT**, and during such period gives written notice to the Company as soon as practicable of:

        1.      the specific **WRONGFUL ACT** and the identities of the potential claimants;

        2.      the injury or damage which has or may result from such specific **WRONGFUL ACT**; and

        3.      the circumstances by which the **INSURED** first became aware of the specific **WRONGFUL ACT**

then any **CLAIM** which is subsequently made against the **INSURED** arising out of such **WRONGFUL ACT** shall, for the purposes of this Policy, be deemed to have been made when such written notice was first given.

C.      The notifications provided for above shall be made to the party set forth in Item 8 of the Declarations.

## VII.    GENERAL CONDITIONS

### A.      APPLICATION

By acceptance of this Policy, all **INSUREDS** agree as follows:

1.   The particulars and statements contained in the application, a copy of which is attached hereto, and any materials submitted therewith (which are on file with the Company and are deemed attached hereto, as if physically attached hereto) are true and are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy;

2.   the statements in the application and in any materials submitted therewith are the **INSUREDS'** representations and shall be deemed material to the acceptance of the risk or the hazard assumed by the Company under this Policy and this Policy is issued in reliance upon the truth of such representations;

3.   in the event the application, including materials submitted therewith, contains any misrepresentation made with the actual intent to deceive or contains any misrepresentation that materially affects either the acceptance of the risk or the hazard assumed by the Company under this Policy, this Policy shall be void in its entirety and of no effect whatsoever; and

4.   this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the **INSUREDS**.

**B.   EXTENDED REPORTING PERIOD**

If the Company cancels this Policy other than for non-payment of premium or does not renew this Policy, the **INSURED** shall have the right, upon payment of an additional premium of 100% of the total policy premium hereunder to an extension of the insurance provided by this Policy with respect to any **CLAIM** made against the **INSURED** during the period of twelve (12) months after the effective date of such cancellation or non-renewal, but only with respect to any **WRONGFUL ACT** committed before the effective date of such cancellation or non-renewal

and otherwise insured under this Policy.

The right to such an extension shall terminate unless written notice is received by the Company from the **INSURED** within thirty (30) days after the effective date of such cancellation or non-renewal with full payment of premium for the Extended Reporting Period, as well as payment of any premium and/or Retention amounts due to the Company.  If such written notice and payment are not received by the Company as aforesaid, the **INSURED** shall not have the right to such an extension.

An increase in premium, a change in the Limits of Liability, or a change in the terms and conditions of the Policy shall not constitute a nonrenewal of this Policy.  Once purchased, an Extended Reporting Period may not be cancelled by either the **INSUREDS** or the Company; however, the Extended Reporting Period shall automatically terminate if the **INSUREDS** purchase other insurance that provides substantially the same coverage as this Policy or would so provide except for the exhaustion of its limits of liability.  If the Extended Reporting Period is automatically terminated as set forth above, all of the premium shall be fully earned at the time of payment.

The Limit of Liability provided during the Extended Reporting Period shall be part of, and not in addition to, the Limit of Liability provided during the **POLICY PERIOD**, as stated in Item 3 of the Declarations.  All other terms and conditions of this Policy shall apply to any **CLAIM** made during the Extended Reporting Period.

## C.     CANCELLATION

This Policy may be cancelled by the **INSURED** by mailing or delivering prior written notice thereof to the Company or by surrender of this Policy to the Company at its address stated in the Declarations.  This Policy may also be cancelled by or on behalf of the Company by mailing to the **INSURED** by registered, certified, or other first class mail, at the **INSURED'S** address stated in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days

thereafter, the cancellation shall be effective.  However, the Company may cancel this Policy for non-payment of premium due on ten (10) days' written notice thereof to the **INSURED**.  The mailing of such notice as aforesaid shall be sufficient proof of the giving of such notice.  The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **POLICY PERIOD**.  If this Policy shall be cancelled by the **INSURED**, the Company shall retain the customary short rate proportion of the premium hereon.  If this Policy shall be cancelled by the Company, the Company shall retain the pro rata proportion of the premium hereon.  Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation by the Company, but such payment shall be made as soon as practicable.

**D.     SUBROGATION**

In the event of any payment under this Policy, the Company shall be subrogated to all the **INSURED'S** rights of recovery therefor against any person or organization, and the **INSURED** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights.  Any amount recovered in excess of the Company's total payment shall be paid to the **INSURED**, less the cost of the Company of such recovery.

**E.     ASSISTANCE AND COOPERATION**

The **INSURED** shall cooperate with the Company and, upon the Company's request, shall submit to examination and interrogation by a representative of the Company, under oath if required, and shall attend hearings, depositions, and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives for the purpose of investigation and/or defense, all without charge to the Company.  The **INSURED** shall further cooperate with the Company and do whatever is necessary, including authorizing claims, actions, or proceedings in the **INSURED'S** name against others, to secure and effect any rights of indemnity, contribution or apportionment

which the **INSURED** may have.  The **INSURED** shall not demand or agree to arbitration of any **CLAIM** made against the **INSURED** without the prior written consent of the Company thereto, which consent shall not be unreasonably withheld.

## F.     ACTION AGAINST THE COMPANY

No action shall lie against the Company unless, as a condition precedent thereto, the **INSURED** shall have fully complied with all the terms, conditions and provisions of the Policy, nor until the amount of the **INSURED'S** obligation to pay shall have been finally determined either by judgment against the **INSURED** after actual trial or by written agreement of the **INSURED**, the claimant, and the Company.  Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy only to the extent of the available insurance afforded by this Policy.  Nothing contained in this Policy shall give any person or organization any right to join the Company as a co-defendant in any action against the **INSURED** to determine the **INSURED'S** liability except as provided by law.

## G.     ENTITY AUTHORIZATION CLAUSE

By acceptance of this Policy, the Entity named in Item 1 of the Declarations agrees to act on behalf of all **INSUREDS** with respect to the giving and receiving of notice of **CLAIM** or cancellation, the payment of premiums and the receiving of any return premiums that may become due under this Policy, and the **INSUREDS** agree that the Entity shall act on their behalf.

## H.     TERRITORY

This Policy only applies to **CLAIMS** made against the **INSUREDS** in the United States of America, its territories or possessions, or Canada.

## I.     ASSIGNMENT

This Policy and any and all rights hereunder are not assignable unless the written consent of the Company is endorsed hereon.

## J.   CONFORMITY TO STATUTE

Any provisions of this Policy that are in conflict with the statutes of the state wherein this Policy is issued are hereby amended to conform to such statutes.

## K.   CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person acting on behalf of the Company shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by endorsement issued to form part of this Policy.

## L.   ENTIRE AGREEMENT

The **INSUREDS** agree that this Policy, including the application and any materials submitted therewith, the Declarations and any written endorsements attached to and forming part of this Policy, constitute the entire agreement between the **INSUREDS** and the Company or any of its agents relating to this insurance.

## M.   FALSE OR FRAUDULENT CLAIM

If an **INSURED** shall fraudulently proffer any **CLAIM** with respect to the amount thereof or otherwise, this Policy shall become void and all coverage hereunder shall be forfeited.

## SECURITY ENDORSEMENT

SECURITY:

|            |                                                         |
|------------|---------------------------------------------------------|
| **100.0000%** | **Lloyd's of London.  Syndicate breakdown as follows:** |
|            |                                                         |
| 37.5000%   | MKL   3000                                              |
| 27.5000%   | CSL   1084                                              |
| 20.0000%   | AUL   1274                                              |
| 15.0000.%  | DRE   1400                                              |
|            |                                                         |
| **100.0000%** | **Total**                                            |

Lloyd's Security 2009

A1    SEC 2

### SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

A2   NMA1168

## MOLD EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that this policy excludes any claim and/or claims expenses directly or indirectly relating to the actual, potential, alleged or threatened presence of any mold, mildew, fungi, spores or other similar organisms.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


A6    MOLD EXCLU 1

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.  The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

A7    LSW 1001 (Insurance)

## CLAIM NOTIFICATION CLAUSE (U.S.A.)

### (Approved by Lloyd's Underwriters' Non-Marine Association)

The Assured upon knowledge of any occurrence likely to give rise to a claim hereunder shall give immediate advice thereof to the Underwriters through

        Clausen Miller PC
        Attn: Randall Marmor
        10 South LaSalle Street
        Chicago, IL  60603-1098

to assess the loss on behalf of Underwriters.

14/12/44

A8    N.M.A. 358

## YIELD SPREAD ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that

This Policy does not apply to Loss in connection with any Claim:

> based upon or directly or indirectly arising out of or resulting from any actual or alleged:
>
> > (1)  yield spread premium,
> > (2)  kickback,
> > (3)  improper split of charges,
> > (4)  improper payment of compensation for the referral of settlement
> >       service business

in connection with any mortgage lending transaction, including but not limited to any Claim for violation of Section 8 of the Real Estate Settlement Practices Act, any rules or regulations promulgated thereunder or pursuant thereto, or any similar provisions of federal, state, or local law, rules or regulations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.


A9    YSP 1

## SERVICE OF SUIT CLAUSE (U.S.A.)

This Service of Suit Clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in any Arbitration provision within this Policy. This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such Arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

**Clausen Miller PC**
**10 South LaSalle Street**
**Chicago, IL 60603-1098**

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

14/09/2005
Form approved by Lloyd's Market Association

A12   LMA5020

## APPLICABLE LAW (U.S.A.)

This Insurance shall be subject to the applicable state law to be determined by the court of competent jurisdiction as determined by the provisions of the Service of Suit Clause (U.S.A.)

14/09/2005
Form approved by Lloyd's Market Association

A13    LMA5021

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**

**For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:**

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.   Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

    (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material"
means source material, special nuclear material or by-product material; "source material",
"special nuclear material", and "by-product material" have the meanings given them in the
Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel
element or fuel component, solid or liquid, which has been used or exposed to radiation in a
nuclear reactor; "waste" means any waste material (1) containing by-product material and (2)
resulting from the operation by any person or organization of any nuclear facility included
within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility"
means:

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or
plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging
waste,

(c)  any equipment or device used for the processing, fabricating or alloying of special nuclear
material if at any time the total amount of such material in the custody of the insured at the
premises where such equipment or device is located consists of or contains more than 25
grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams
of uranium 235,

(d)  any structure, basin, excavation, premises or place prepared or used for the storage or
disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on
such site and all premises used for such operations; "nuclear reactor" means any apparatus
designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain
a critical mass of fissionable material.  With respect to injury to or destruction of property,
the word "injury" or "destruction" includes all forms of radioactive contamination of
property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause
is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the
words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60

A14    NMA1256

## PREMIUM CANCELLATION SCHEDULE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the **Assured** the Earned Premium shall be computed as follows:

## SHORT RATE CANCELLATION TABLE

A.   For insurances written for one year:

| Days Insurance in Force | | Percent of One Year Premium | Days Insurance in Force | | Percent of One Year Premium |
|---|---|---|---|---|---|
| 1 - 73 | | 30 | 206 - 209 | | 66 |
| 74 - 76 | | 31 | 210 - 214 | (7 months) | 67 |
| 77 - 80 | | 32 | 215 - 218 | | 68 |
| 81 - 83 | | 33 | 219 - 223 | | 69 |
| 84 - 87 | | 34 | 224 - 228 | | 70 |
| 88 - 91 | (3 months) | 35 | 229 - 232 | | 71 |
| 92 - 94 | | 36 | 233 - 237 | | 72 |
| 95 - 98 | | 37 | 238 - 241 | | 73 |
| 99 - 102 | | 38 | 242 - 246 | (8 months) | 74 |
| 103 - 105 | | 39 | 247 - 250 | | 75 |
| 106 - 109 | | 40 | 251 - 255 | | 76 |
| 110 - 113 | | 41 | 256 - 260 | | 77 |
| 114 - 116 | | 42 | 261 - 264 | | 78 |
| 117 - 120 | | 43 | 265 - 269 | | 79 |
| 121 - 124 | (4 months) | 44 | 270 - 273 | (9 months) | 80 |
| 125 - 127 | | 45 | 274 - 278 | | 81 |
| 128 - 131 | | 46 | 279 - 282 | | 82 |
| 132 - 135 | | 47 | 283 - 287 | | 83 |
| 136 - 138 | | 48 | 288 - 291 | | 84 |
| 139 - 142 | | 49 | 292 - 296 | | 85 |
| 143 - 146 | | 50 | 297 - 301 | | 86 |
| 147 - 149 | | 51 | 302 - 305 | (10 months) | 87 |
| 150 - 153 | (5 months) | 52 | 306 - 310 | | 88 |
| 154 - 156 | | 53 | 311 - 314 | | 89 |
| 157 - 160 | | 54 | 315 - 319 | | 90 |
| 161 - 164 | | 55 | 320 - 323 | | 91 |
| 165 - 167 | | 56 | 324 - 328 | | 92 |
| 168 - 171 | | 57 | 329 - 332 | | 93 |
| 172 - 175 | | 58 | 333 - 337 | (11 months) | 94 |
| 176 - 178 | | 59 | 338 - 342 | | 95 |
| 179 - 182 | (6 months) | 60 | 343 - 346 | | 96 |
| 183 - 187 | | 61 | 347 - 351 | | 97 |
| 188 - 191 | | 62 | 352 - 355 | | 98 |
| 192 - 196 | | 63 | 356 - 360 | | 99 |
| 197 - 200 | | 64 | 361 - 365 | (12 months) | 100 |
| 201 - 205 | | 65 | | | |

B.    For Insurances written for more or less than one year:

    1.  If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

    2.  If insurance has been in force for more than 12 months:

        (a)  Determine full annual premium as for an insurance written for a term of one year.

        (b)  Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

        (c)  Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

Furthermore and notwithstanding the foregoing, Underwriters shall retain the total premium for this Certificate, such total premium to be deemed earned upon inception of the Certificate if any **Claim** or **Circumstance** is reported to Underwriters under this Certificate on or before such date of cancellation.

A15    PCS 1

## ENDORSEMENT

To be attached to and form part of Policy Number:  SUA 12139

In favor of: NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC.,
NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND
NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING
SYSTEMS, INC.

In consideration of the premium charged, it is understood and agreed that Exclusion W.
of the "Professional Services Liability Policy" is deleted in its entirety.


ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

The effective date of this endorsement is November 30, 2009.



A17    DEL W

## ENDORSEMENT

To be attached to and form part of Policy Number:  **SUA 12139**

In favor of: **NOTEWORLD LLC, SUBSIDIARIES: NOTEWORLD COMPANY, INC., NOTEWORLD WASHINGTON, INC., NOTEWORLD CALIFORNIA, INC., AND NOTEWORLD FINANCIAL LLC; AND AFFILIATE: NOTEWORLD SERVICING SYSTEMS, INC.**

In consideration of the premium paid, it is hereby understood and agreed that this Policy does not apply to LOSS based upon or directly or indirectly arising out of or resulting from any CLAIM, matter, fact, circumstance, situation, event or transaction described in the application for this Policy.

It is further understood and agreed that this endorsement applies to the claims previously submitted with policy SUA 11866.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

A21    SCE 1



## STATESIDE UNDERWRITING AGENCY
### 5435 Bull Valley Road, Suite 212
### McHenry, IL 60050

*Instructions for Applicant Organization*: Please type or print in ink. Answer all questions. If a question is not applicable, state NOT APPLICABLE. If the answer to any question is none, state NONE. If space is insufficient to answer any question fully, attach a separate sheet(s).

## MORTGAGE BANKERS BOND/ PROFESSIONAL LIABILITY APPLICATION
## THIS IS AN APPLICATION FOR A CLAIMS MADE AND REPORTED POLICY.

ALSO INCLUDE WITH THIS APPLICATION RESUMES OF KEY SENIOR PERSONNEL AND LATEST FULL YEAR FINANCIALS AND ANY INTERIM FINANCIALS AVAILABLE.

### GENERAL INFORMATION

1.  a.  Name of Applicant (include any subsidiaries for which coverage is requested): __NoteWorld LLC;__ __subsidiaries NoteWorld Company, Inc., NoteWorld Washington, Inc., NoteWorld California, Inc., and__ __NoteWorld Financial LLC; and affiliate NoteWorld Servicing Systems, Inc.__

    b.  Address (No. & St.): __1001 Pacific Avenue, Suite 200__

    City: __Tacoma__                          State: __WA__          Zip: __98402__

    c.  Year Established: __1998__

2.  a.  Number of Locations: __7__      List Name and address for each location (on a separate sheet if necessary): See attached Exhibit 1

    b.  Number of Locations with Underwriting Authority: __N/A__

3.  a.  Applicant is a: ☒ Corporation:  ☐ Partnership:  ☐ Sole Proprietor  ☒ LLC

    b.  Has there been any change in ownership or management in the past three years?........................... ☒ Yes ☐ No
       If "Yes," explain: __Linda G. Remsberg became owner of NoteWorld LLC on 11/30/2007.__

    c.  Identify all principals, persons, or entities owning 10% or more of the Applicant Company(ies), Parent Company (if any, please identify such as the parent), and indicate the percentage of ownership for each.
       __Linda Remsberg is the sole owner and member of NoteWorld LLC.__

       If "Yes," please list: __See attached Exhibit 2__

    d.  Contact information:
       Contact Person and Title: __Gloria J. Greeley, Compliance Manager__
       Fax Number: __(253) 620-7178__
       E-mail Address: __ggreeley@noteworld.com__
       Web Address: __www.noteworld.com__

### TYPE OF OPERATION

4.  What percentage (if any) of the below Loan Origination Volume was funded by the Applicant's Warehouse Line?.................................................................................................................................. __N/A__ %

5. Mortgage Banking/ Mortgage Brokering Activities for the twelve (12) months ending: **09/30/2009**
   Servicing

|   |   | Number of Loans See figures to the right | Dollar Volume |   | Servicing | # of Accts | Gross Servicing Revenue |
|---|---|---|---|---|---|---|---|
| a. | Servicing: |   |   |   |   |   |   |
| b. | Origination: | N/A | N/A |   | Mtg Related Accts | 22,235 | $ 6,185,063 |
| c. | Origination Percentage: |   |   |   |   |   |   |
|   | 1-4—Family Residential |   | N/A | % | 3rd Party Pmt Processing | 82,432 | $ 7,691,253 |
|   | Multi-family |   | N/A | % |   |   |   |
|   | Other Income Property |   | N/A | % | Totals | 104,667 | $13,783,316 |
|   | Other (please describe ____) |   | N/A | % |   |   |   |
|   | Total |   |   | 100% |   |   |   |

| d. | Type of Loans Originated: |   |   |
|---|---|---|---|
|   | FHA/VA/Conventional | N/A | % |
|   | Second/Equity Line Lending | N/A | % |
|   | Construction Lending | N/A | % |
|   | Mobile Home Lending | N/A | % |
|   | Sub-Prime (please describe* ____) | N/A | % |
|   | Other (please describe ____) | N/A | % |
|   | Total | | 100% |

* (Note: If any Sub-Prime Loans, must complete Lending Supplemental Application: Sub-Prime Loans are those loans with a FICO score of 619 or less)

6. Does the Applicant act as a master servicer of loans? ................................................................ ☐ Yes ☒ No
   If "Yes," please provide details (including dollar amount of activity and source of funding):
   **NoteWorld does not fund or purchase loans, provides servicing only. See financial statement attached as Exhibit 3**

7. List current number of employees by the following activities
   a. Mortgage Banking Professional Employees
      (1) Board of Directors, Corporate Officers .......... 3
      (2) Loan Production .......... 0
      (3) Loan Servicing .......... 0
      (4) All Other Professional .......... 0
   b. Non-Mortgage Banking Professional Employees (Admin, Marketing, Sales, IT, HR, etc.) .......... 42
   c. Clerical Employees (including payment processing) .......... 61
                                                                    106   Total Employees

   d. Independent Loan Originators acting as Independent Contractors (ICs) .......... 0
      (Is coverage desired for these Independent Contractors).................................................. ☐ Yes ☐ No N/A

   (Please note coverage for ICs is only available if quoted by underwriters and that we will only provide coverage for ICs that do only loan origination services for you and do not work for anyone else.)

## COMPANY PROCEDURES

8. Please confirm the Applicant has procedures to assure timely and proper disclosure of Good Faith Estimates and Truth in Lending Estimates. .......................................................... ☐ Yes ☐ No N/A

9. Does the Applicant know of any or have any reported violations of laws in any of the following:
   a. Real Estate Settlement Procedures Act ...................................................................... ☐ Yes ☒ No
   b. Truth in Lending Legislation ...................................................................................... ☐ Yes ☒ No

    c.   Equal Credit Opportunity Legislation ............................................................................. ☐ Yes ☒ No

10.   Does the Insured have written policies with respect to the above as shown in question 9. (a., b., or c.), and are employees trained to comply)? ..................................................................... ☐ Yes ☐ No N/A

11.   Are appraisals performed by in-house appraisers? ................................................................. ☐ Yes ☐ No N/A
    If so, who assigns the appraisals (list the person's position)?

_____

12.   Are appraisals provided on a rotating basis? ........................................................................ ☐ Yes ☐ No N/A
    If "No," please advise how the Applicant protects itself from collusion between an appraiser and a loan officer.

_____
_____

13.   a.   Please describe below how denials of credit are offered.
      N/A

_____
_____

    b.   How has the Applicant addressed (including any new procedures or policies) the issue of predatory lending prac-
      tices to prevent lawsuits in this area?
      N/A

_____
_____

14.   What percentage of the number of total loans originated are reviewed by separate quality control per-
    sonnel? .................................................................................................................... N/A    %

15.   Does the Applicant obtain or anticipate revenues from any other services other than Loan Origination
    Activities? ................................................................................................................. ☒ Yes ☐ No
    If so, please describe.
    **Servicing fees and commissions from activities related to the sale and purchase of seller financed**
    **obligations. None of the companies engage in loan origination activities.**

16.   To what professional associations does the Applicant firm belong?
    **See attached Exhibit 4.**

17.   Has the Applicant ever been required to repurchase any loan(s)? ........................................... ☐ Yes ☐ No N/A
    If so, please provide details as to when and what caused the repurchase.

_____
_____

18.   a.   Does the Applicant operate in states which require a Mortgage Broker or Mortgage Correspondent
      to be licensed? ....................................................................................................... ☒ Yes ☐ No

    b.   If "Yes," please confirm all licenses are in force. ......................................................... ☒ Yes ☐ No

    c.   Has the Applicant had any investigations into licensing or are there any ongoing license investiga-
      tions from any state agency or other authority? ........................................................... ☒ Yes ☐ No
      If "Yes," please provide full details of investigation including the outcome and/or status: _____
      **See attached Exhibit 5**

    d.   Does the Applicant commingle investor funds or any other funds required to be segregated by law
      or a third party? ...................................................................................................... ☐ Yes ☒ No

e.  Does the Applicant have a written procedural manual for employees to follow?...................☒ Yes ☐ No

f.  Does the Applicant have a formalized training program for newly hired employees? ..................☒ Yes ☐ No
If "No" to question 18.e. or 18.f., how does the Applicant train new employees and/or confirm that managers are performing according to company guidelines? _____

19.  Does the Applicant participate in any telemarketing programs (either directly or indirectly)?...............☐ Yes ☒ No
If so, how does the Applicant protect itself from claims from consumers on "Do Not Call Lists/registries"?
_____
_____
_____
_____

20.  a  Does the Applicant purchase any type of "Fraud" insurance or protection?...............................☒ Yes ☐ No
(Note Fraud coverage may be available, but is not the same as Fidelity Bond or Mortgage Bankers Bond coverage.)

b.  Is the Applicant interested in a proposal for the broader form of Mortgage Fraud Insurance, if available? ...........
............................................................................................................☐ Yes ☒ No

21.  Does the Applicant have a fraud monitoring or prevention system in place?.............................☒ Yes ☐ No
If "Yes", please describe  **Standard procedures, anti-money laundering and ID theft policies.** _____

22.  Does the Applicant have a fraud guard protection system or similar procedure to verify legitimacy of borrowers by checking social security numbers or another method to determine borrower identity?...........................☒ Yes ☐ No

23.  Does the Applicant utilize Automated Valuations and compare to on site appraisals:
Before Closing.................................................................................☐ Yes ☐ No N/A
Post Closing....................................................................................☐ Yes ☐ No N/A

24.  a.  Does the Applicant utilize a tracking system throughout the loan process such as "ENCOMPASS" or other similar system? ................................................................................................☐ Yes ☐ No N/A

b.  Does the Applicant utilize a checklist (manual or automated) to confirm all appropriate steps have been accomplished? ...............................................................................................☐ Yes ☐ No N/A

25.  Please confirm that the Applicant has dual controls in place so that no single person can control the loan throughout the entire loan origination or underwriting process?................................................................☐ Yes ☐ No N/A

26.  If the Applicant originates loans through mortgage brokers submitting to the Applicant, are the following coverages required of the Mortgage Broker to do business with the Applicant?
a.  Fidelity/Employee Dishonesty Bond (also knows as a Mortgage Bankers Bond)........................☐ Yes ☐ No N/A
b.  Servicing Errors & Omissions (sometimes called Investor E&O)...........................................☐ Yes ☐ No N/A
c.  Mortgage Company Professional Liability....................................................................☐ Yes ☐ No N/A

Note that a credit for the insured's premium may be allowed if the insured requires the mortgage brokers it works with to have both Fidelity, E&O and Professional Liability coverage.

27.  Please confirm the following:
a.  The Applicant verifies all firms or individuals it does business with are licensed as required by law in each jurisdiction required? **Applicant does conduct Office of Foreign Assets Control/Bank Secrecy Act screenings** ☐ Yes ☒ No
b.  If the Applicant has "1099 employees" working in any of its branch operations (or home office) under the Applicant's own name, the Applicant requires the 1099 loan originator to warrant that it originates loans solely for the Applicant?.........................................................................................☐ Yes ☐ No N/A

28.  Does the Applicant not only verify that it's originators (both employees and 1099 status) are licensed, but also are not registered to another company's address where such information is available?................................☐ Yes ☐ No N/A

29.  Has the Applicant hired within the last 12 months a large number (more than 20% of the Applicants total staff at the time of signing this application) of loan originators formerly employed by a competitor?......................☐ Yes ☐ No N/A

## AUDITING/QUALITY CONTROL INFORMATION

30. Does the applicant utilize MARI for:
   a. New employees? .......................................................................................................... ☐Yes ☐No NA
   b. New Mortgage Brokers? ............................................................................................... ☐Yes ☐No NA
   c. Closing Agents? ............................................................................................................ ☐Yes ☐No NA

31. Are discretionary audits to be done at request of managers or due to litigation or other triggers of audits not part of the normal quality control process? ................................................................................... ☐Yes ☐No NA

32. Does the Applicant's Quality Control function include a new originator review and a review of new branches (if applicable)? ................................................................................................ ☐Yes ☐No NA

33. If the Applicant deals with correspondents, are these loans underwritten at the branch level? ..........................
   .............................................................................................. ☐ Yes ☐ No ☒ Not Applicable

34. Does the Applicant use Lexus or similar search systems to check on new employees? ..................... ☒Yes ☐ No

35. Does the Applicant have a compliance officer or similar position? ................................................. ☒Yes ☐ No

## INSURANCE AND CLAIM INFORMATION

36. Do you currently carry the following:
   a. Professional Liability Insurance? .......................................................................... ☒Yes ☐ No
      If "Yes," please complete the following:

| Policy Period | Carrier | Limit of Liability | Deductible | Premium | Retro Date |
|---|---|---|---|---|---|
| 11/30/08 - 11/30/09 | Lloyds | $3,000,000 | $25,000 | $35,700 | |

   b. Surety Bond? .......................................................................................................... ☒Yes ☐ No
      If "Yes," please complete the following:

| Policy Period | Carrier | Limit of Liability | Deductible | Premium |
|---|---|---|---|---|
| See attached Exhibit 6. | | | | |

   c. General Liability Insurance? ................................................................................ ☒Yes ☐ No
      If "Yes," please complete the following:

| Policy Period | Carrier | Limit of Liability | Deductible | Premium |
|---|---|---|---|---|
| 11/30/08 - 11/30/09 | Travelers | $2,000,000* | $10,000 | $31,360 |

   d. Fidelity Bond?  * Plus $10,000,000 Umbrella ................................................. ☒Yes ☐ No
      If "Yes," please complete the following:

| Policy Period | Carrier | Limit of Liability | Deductible | Premium | Retro Date |
|---|---|---|---|---|---|
| 11/30/08 - 11/30/09 | Lloyds | $3,000,000 | $10,000 | $16,288 | |

37. Was prior coverage ever cancelled or non-renewed? (OTHER THAN BEING NON-RENEWED DUE TO THE CARRIER NO LONGER WRITING THIS TYPE OF COVERAGE) (NOT APPLICABLE TO MISSOURI APPLICANTS) ................................................................................... ☐ Yes ☒ No
   IF "YES," PLEASE EXPLAIN REASON FOR NON-RENEWAL OR CANCELLATION.

38. During the past five years, has the Applicant or any predecessor in business or any of the past or present partners, Officers, Directors, or employees been the subject of an investigation, reprimand, disciplinary action, criticism, or filed complaint by the FHA, VA, PMI carrier, any investor, authority, or governmental agency? ................................................................................ ☒Yes ☐ No
   If "Yes," how many?  7
   If "Yes," provide full details for each circumstance.  See attached Exhibit 7.

39. Has any professional liability claim or suit ever been brought against the Applicant and/or any prede-
cessor company and/or any person proposed to be insured?..................................................... ☐ Yes ☒ No

If "Yes," how many? _____

If "Yes," please complete a Claim Supplement/Potential Claim Supplement for each.

40. Does the applicant, or any predecessor in business or any of the past or present partners, Officers, Directors, or
employees have any reasonable basis:

    a.  to believe that there has been a breach of a professional duty?..................................................... ☐ Yes ☒ No

    b.  to believe that the applicant or any predecessor in business or any of the past or present partners,
       Officers, Directors or employees are aware of any circumstances, incidents, or situations during the
       past five years which may result in claims being made against the applicant, any of the past or pre-
       sent partners, Officers, Directors or employees or former employees of the applicant? ................... ☐ Yes ☒ No

       If "Yes," how many? _____

       **If there is knowledge of any such fact, circumstance, or situation, any claim or action subsequently ema-
       nating therefrom shall be excluded from coverage under the proposed insurance.**

41. Coverage request

    a.  Professional Liability   $_____ each wrongful act

       Limit requested         $_____ aggregate

    b.  Professional Liability

       Deductible requested   $_____ each wrongful act

**Please include the following items with this application:**

a.  Resumes of any new Key Senior Personnel  **See attached Exhibit 8**

b.  Latest full year financial statement or annual report and Interim Financials  **See attached Exhibit 3**

The undersigned authorized person, on behalf of the Applicant, attest that all claims have been reported if the Applicant is
aware of them.  The Applicant further understands that any claim submitted after the completion of this application shall
render any terms provided void and Underwriters shall have the right to re-underwrite the Applicant.  In addition, no infor-
mation provided by this application or along with this application shall be deemed to report a claim.  Such notice should be
made as instructed by the policy.

The undersigned authorized person, on behalf of the applicant, attests that to the best of his/her knowledge and belief the
statements set forth herein are true. Although the signing of this Application Form does not bind the undersigned to effect
insurance, the undersigned agrees that this application and the said statements shall be the basis of the policy of insur-
ance and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a
policy.

The undersigned authorized person on behalf of the applicant declares that the above statements are true, that neither
the undersigned person nor the applicant has suppressed or misstated facts and that at the present time the applicant has
no reason to anticipate any claims being brought against the applicant or any representative of the applicant or knowledge
of any negligent act, error, omission or offense on the applicant's part or any representative of the applicant except as
stated herein, and agrees that this Application Form shall be the basis of the contract between the applicant and the
Company and shall be deemed a part hereof.

NEW YORK—WARNING: Any person who knowingly and with intent to defraud any insurance company or other person
files an application for insurance or statement of claim containing any materially false information, or conceals for the pur-
pose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a
crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for
each such violation.

FRAUD WARNING: Any person who knowingly and with intent to defraud any insurance company or other person files an
application for insurance or statement of claim containing any materially false information or conceals for the purpose of

misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signing this form does not bind you to complete the insurance. Coverage will become effective upon approval of the application and issuance of the policy. It is agreed that this form will be the basis of the contract. Should a policy be issued, this form will be attached to and become a part of the policy.

Signature: _____

Title: _____Sole Member / President_____          Date: __11/4/2009__
                    (Must be signed by Owner, Partner or President)                              Month/Day/Year

| Producer's Name | Area Code | Phone Number |
|---|---|---|

Producer:   Will you make the surplus line filing for this policy?.................................................................[X] Yes [ ] No

            Your Surplus Lines Number: _____

# Exhibit 1

# NoteWorld
# Servicing Center

## NATIONAL OFFICE LOCATIONS

### ARIZONA

**Service Center**
2700 North Central Avenue, Suite 400
Phoenix, AZ 85004
PO Box 2986, Phoenix, AZ 85062
(800) 473-3898

1858 Golden Gate
Kingman, AZ 86401
(866) 622-0593

### CALIFORNIA

P.O. Box 631
El Dorado, CA  95623
(800) 473-3898

### WASHINGTON

**Corporate Headquarters**
1001 Pacific Avenue, Suite 200
Tacoma, WA 98402
PO Box 2236, Tacoma, WA 98401
(800) 709-6981

### OREGON

320 SW Upper Terrace Drive, Suite 102
Bend, OR 97702
(800) 535-0321

600 Country Club Road
Eugene, OR 97401
PO Box 10947, Eugene, OR 97440
(866) 487-7100

820 NE 7th St
Grants Pass, OR 97526
PO Box 428, Grants Pass, OR 97528
(800) 618-6310



# Exhibit 2





# Exhibit 3

NOTEWORLD LLC
AND SUBSIDIARIES


CONSOLIDATED FINANCIAL STATEMENTS


FOR THE YEARS ENDED
DECEMBER 31, 2008 AND 2007

From:Peggy Foote FaxID:                           Page 22 of 64                        Date:11/5/2009 12:00 PM Page:22 of 6

# NOTEWORLD LLC AND SUBSIDIARIES

## TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT                                    Page 3

FINANCIAL STATEMENTS:

   Consolidated Balance Sheets                                  4

   Consolidated Statements of Income                            5

   Consolidated Statements of Member's Equity                   6

   Consolidated Statements of Cash Flows                        7

   Notes to Consolidated Financial Statements              8 - 18



**Shannon&**
**Associates** LLP
Certified Public Accountants
& Business Consultants

## INDEPENDENT AUDITOR'S REPORT

To the Member
NoteWorld LLC and Subsidiaries
Tacoma, Washington

We have audited the accompanying consolidated balance sheets of NoteWorld LLC and Subsidiaries as of December 31, 2008 and 2007, and the related consolidated statements of income, member's equity, and cash flows for the years then ended.   These consolidated financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of NoteWorld LLC and Subsidiaries as of December 31, 2008 and 2007, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Shannon & Associates, LLP*

Kent, Washington
March 4, 2009



### NOTEWORLD LLC AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
### DECEMBER 31, 2008 AND 2007

#### ASSETS

**CURRENT ASSETS**
  Cash
  Accounts receivable
  Prepaid expenses
  Income taxes receivable
  Servicing rights, current portion, 2008 at fair value,
    2007 at amortized cost

      TOTAL CURRENT ASSETS          **Financial Information Redacted**

**LEASEHOLD IMPROVEMENTS, FURNITURE
AND EQUIPMENT, net**

**SERVICING RIGHTS, 2008 at fair value,
2007 at amortized cost**

**OTHER ASSETS**

**DEFERRED INCOME TAX**

      TOTAL ASSETS

#### LIABILITIES AND MEMBER'S EQUITY

**CURRENT LIABILITIES**
  Line of credit
  Accounts payable and other liabilities

      TOTAL CURRENT LIABILITIES          **Financial Information Redacted**

**MEMBER'S EQUITY**
  Member's capital
  Less receivable from member

      TOTAL MEMBER'S EQUITY

    TOTAL LIABILITIES AND MEMBER'S EQUITY

The accompanying notes are an integral part of these financial statements.

-4-

# NOTEWORLD LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME
### FOR THE YEARS ENDED DECEMBER 31, 2008 AND 2007

**REVENUE**
  Servicing fees
  Commission income
  Other income

### TOTAL REVENUE

**EXPENSES**
  Compensation and benefits
  General and administrative expenses
  Postage and delivery
  Rent and occupancy
  Depreciation
  Telephone
  Transactions costs for brokered notes
  Amortization of servicing rights
  Interest expense

**Financial
Information
Redacted**

### TOTAL EXPENSES

### INCOME FROM OPERATIONS

### INCREASE IN FAIR VALUE OF SERVICING RIGHTS

### INCOME AND EXPENSE ALLOCATION FROM AFFILIATE
  Affiliate income allocation
  Less affiliate expense allocation

### NET AFFILIATE ALLOCATION

### NET INCOME

**Financial
Information
Redacted**

The accompanying notes are an integral part of these financial statements.

-5-

NOTEWORLD LLC AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF MEMBER'S EQUITY
FOR THE YEARS ENDED DECEMBER 31, 2008 AND 2007

Balance, December 31, 2006

  Distribution to former member

  Distribution to new member

  Net income

  Member's capital

  Less receivable from member

Balance, December 31, 2007

  Initial adoption of SFAS No 156, January 1, 2008

  Distribution to member, net

  Net income

Balance, December 31, 2008

**Financial
Information
Redacted**

The accompanying notes are an integral part of these financial statements.

-6-

### NOTEWORLD LLC AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF CASH FLOWS
### FOR THE YEARS ENDED DECEMBER 31, 2008 AND 2007

OPERATING ACTIVITIES
  Net income
  Adjustments to reconcile net income to net cash
    provided (used) by operating activities:
      Increase in fair value of servicing rights
      Depreciation and amortization
      Loss on sale of furniture and equipment
      Amortization of servicing rights
      Deferred income taxes
      Changes in operating assets and liabilities:
        Increase in accounts receivable
        Increase in prepaid expenses and other assets
        Decrease in income taxes receivable
        Increase (decrease) in accounts payable and other liabilities

**Financial Information Redacted**

    NET CASH PROVIDED BY OPERATING ACTIVITIES

INVESTING ACTIVITIES
  Purchase of servicing rights
  Proceeds from sale of furniture and equipment
  Purchase of leasehold improvements, furniture and equipment

    NET CASH USED BY INVESTING ACTIVITIES

FINANCING ACTIVITIES
  Repayment of borrowings from affiliates, net
  (Repayment) proceeds from line of credit
  Loan to new member
  Distribution to former member
  Distribution to new member, net

    NET CASH USED BY FINANCING ACTIVITIES

        DECREASE IN CASH

**Financial Information Redacted**

Cash
  Beginning of year

  End of year

Supplemental disclosure of cash flow information
  Cash paid during the year for:
    Interest
    Taxes
Non-cash investing and financing activities
  Receivable from member satisfied via distribution to member

The accompanying notes are an integral part of these financial statements.

NOTEWORLD LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 2008 AND 2007

## NOTE 1.—ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Formation and Acquisition

In 1998, Credit-Based Asset Servicing & Securitization LLC ("C-BASS") established through a series of transactions NoteWorld LLC ("NoteWorld"). At November 30, 2007, NoteWorld was acquired by a key employee for $1,000,000. Preceding the acquisition, $1,107,629 was distributed to the former member.

NoteWorld and its wholly-owned subsidiaries provide payment processing to customers nationwide through a servicing agreement according to the original contract of the parties. The customers of NoteWorld primarily consist of sellers financing the sale of real property and individuals using the payment processing services of NoteWorld to remit payments to creditors. The signers of the agreement are employing NoteWorld as their servicing agent whereby NoteWorld is directed to establish a main account and any subaccounts according to the provisions of the contracts and to receive, process and remit payments as instructed by the contracts. Receipts and disbursements are made by check or electronic bank transfers.

NoteWorld also owns three subsidiaries (all C-corporations) engaged in servicing seller-financed mortgages. NoteWorld also serves as trustee for two separate trusts that hold customer cash deposits in escrow throughout the payment processing cycle.

South Plains Mortgage LLC, a wholly-owned subsidiary of NoteWorld, provides a brokering service for seller-financed notes. On May 1, 2008, South Plains Mortgage LLC changed its name to NoteWorld Financial LLC.

Effective January 1, 2008, the member (NoteWorld's sole owner) established NoteWorld Servicing System, Inc. (NSSI). NSSI's business purpose is to provide trust accounting and escrow account reconciliation services for a financial institution.

### Basis of Presentation

The consolidated financial statements include the accounts of NoteWorld and its subsidiaries, combined with NoteWorld Servicing System, Inc. ("Company"). NoteWorld LLC and subsidiaries as used in these consolidated financial statements include all these entities. All intercompany balances and transactions have been eliminated.

After the complete change in ownership occurring on November 30, 2007, as pertaining to the acquisition of NoteWorld by the new member, NoteWorld continued to use its historical cost basis in assets, liabilities and member's equity for financial accounting and reporting.

-8-

NOTEWORLD LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2008 AND 2007

NOTE 1.– ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING
POLICIES (Continued)

Revenue Recognition

Revenues from governmental agencies and debt settlement companies are recognized on an accrual basis. Generally consumer revenues are considered earned at the time a payment is processed with the appropriate fee being collected at that time. Ancillary fees may be paid at the time of the service being performed or are billed to the consumer. Ancillary fees billed to consumers are recognized when earned.

Servicing fee revenue on the consolidated statements of income is comprised of the following:

| | |
|---|---|
| Seller-financed servicing | **Financial** |
| Personal account services | **Information** |
| Total servicing fees | **Redacted** |

Accounts Receivable

Accounts receivable consists of amounts due from customers for services performed and fees for insufficient checks. In addition, at December 31, 2008, $289,039 of accounts receivable is a refund from a bonding company. The Company recorded an allowance for doubtful accounts in the amount of $12,717 and $15,759 at December 31, 2008 and 2007, respectively. All accounts aged at 90 days are written off.

Leasehold Improvements, Furniture and Equipment

Computer hardware and software, furniture and fixtures, and leasehold improvements are stated at cost, net of accumulated depreciation. Depreciation is provided using the straight-line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the shorter of their useful lives or the lease term.

Capitalization of Software Costs

Costs related to the development and implementation of new software for internal use have been capitalized. All costs prior to application development stage have been expensed, and costs incurred subsequent to application development stage have been capitalized in accordance with AICPA Statement of Position 98-1, *Accounting for the Cost of Computer Software Developed or Obtained for Internal Use*. Amortization is provided using the straight-line method over the estimated useful life of five years.

### NOTEWORLD LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
### DECEMBER 31, 2008 AND 2007

## NOTE 1.--ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Advertising

Advertising costs are expensed as incurred or expensed the first time the advertising takes place.   Total advertising costs approximated to $87,000 and $147,000 for the years ended December 31, 2008 and 2007, respectively.

## NOTE 2.--LEASEHOLD IMPROVEMENTS, FURNITURE AND EQUIPMENT

Leasehold improvements, furniture and equipment at December 31, 2008 and 2007, consist of the following:

Leasehold improvements, furniture and equipment
Software
Accumulated depreciation and amortization - leasehold
  improvements, furniture and equipment
Accumulated depreciation - software

**Financial Information Redacted**

## NOTE 3.--SERVICING RIGHTS

Effective January 1, 2008, the Company accounts for servicing rights at fair value with changes in fair value through December 31, 2008, recorded in the Consolidated Statement of Income.  The following table presents activity for servicing rights for December 31, 2007, to December 31, 2008:

Carrying amount at December 31, 2007, at amortized cost
Net increase from adoption of SFAS No. 156
    Fair value at January 1, 2008
Additions during 2008:
  Purchases of servicing assets (at cost)
Changes in servicing right estimated fair value
    Fair value at December 31, 2008

**Financial Information Redacted**

### Level 3 Valuation Techniques

Financial instruments are considered Level 3 when their values are determined using pricing models, discounted cash flow methodologies, or similar techniques and at least one significant model assumption or input is unobservable.  Level 3 financial instruments also include those for which the determination of fair value requires significant management judgment or estimation.

NOTEWORLD LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2008 AND 2007

### NOTE 3.--SERVICING RIGHTS (Continued)

Level 3 Valuation Techniques (Continued)

In 2008, changes in servicing rights ("SR") market value of $1,760,927 reflect, among other, the changes in prepayment assumptions, interest rates, and net revenue stream per loan. As of December 31, 2008, the fair value of SR was $4,454,000, and the modeled weighted average lives of SR was 3.97 years.

The values used in the cash flow model were based on the following key assumptions at December 31, 2008:

Loan prepayment rate
Discount rate
Annual revenue per loan, net

**Financial
Information
Redacted**

The table below presents the sensitivity of the weighted average lives and fair value of SR to changes in modeled assumptions at December 31, 2008.

| Assumptions | Change in Weighted Average life | Change in Fair Value |
|---|---|---|
| **Prepayment Rates** | | |
| Impact of 10% increase | | |
| Impact of 20% increase | | |
| Impact of 10% decrease | | |
| Impact of 20% decrease | | |
| **Discount Rate Assumption** | | |
| Impact of 1% increase | | |
| Impact of 2% increase | | |
| Impact of 3% increase | | |
| Impact of 1% decrease | | |
| Impact of 2% decrease | | |
| Impact of 3% decrease | | |
| **Net Revenue changes** | | |
| Impact of $10 increase | | |
| Impact of $25 increase | | |
| Impact of $10 decrease | | |
| Impact of $25 decrease | | |

**Financial
Information
Redacted**

Changes in economic conditions, prepayment rates, operational cost structure, and availability of market participants may result in revisions to management's Level 3 assumptions and the resulting fair value of servicing rights. Any such revisions are recognized in the period in which the revisions are determined.

-13-

## NOTEWORLD LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
## DECEMBER 31, 2008 AND 2007

### NOTE 4.—COLLATERAL GUARANTEES AND LINE OF CREDIT

During 2007, the former member borrowed funds under a syndicated facility requiring substantially all of the Company's assets to be pledged as collateral. The Company's assets were released as collateral for the syndicated facility when the Company was acquired by the new member on November 30, 2007.

As part of the acquisition by the new member, the Company obtained a line of credit from Columbia Bank for $2,000,000. The line of credit bears interest at prime (7.5% at December 31, 2007) and calls for monthly payments of interest with principal due at maturity, November 1, 2008. The line of credit was renewed for 60 days to December 31, 2008, with subsequent renewal to January 5, 2010, bearing interest at prime plus 1% (4.25% at December 31, 2008) and a floor of 5%. At December 31, 2008, the Company had utilized $250,556 of the line of credit. The line of credit is guaranteed by the member and collateralized by the assets of the Company.

Under the terms of the business line of credit the Company has with the Bank, the Company must comply with certain covenants and ratios.

The Company shall maintain a working capital minimum of $400,000. Also, the Company shall maintain a ratio of earnings before interest and taxes to interest of not less than 5.00 to 1.00, tested quarterly, and cash flow leverage of less than 1.25 to 1.00, tested quarterly for the most recent 12 months. Cash flow leverage is defined as ratio of total funded debt to earnings before interest, taxes, depreciation and amortization (EBITDA).

### NOTE 5.—INCOME TAXES – FOR SUBSIDIARY C-CORPORATIONS

The components of federal and state income tax expense for subsidiary C corporations (included in general and administrative expenses) for the years ended December 31, 2008 and 2007, are as follows:

Current expense

Deferred expense

**Financial Information Redacted**

The deferred income tax asset at December 31, 2008 and 2007, consists of the following temporary differences:

Purchased servicing rights

Other

Deferred income tax asset

**Financial Information Redacted**

-14-

## NOTEWORLD LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
### DECEMBER 31, 2008 AND 2007

### NOTE 5.—INCOME TAXES - FOR SUBSIDIARY C-CORPORATIONS (Continued)

The combined effective federal and state tax rate for 2008 and 2007 is 42.2% and 19.2%, respectively. For 2007, the difference between statutory and effective tax rates results is due to graduated federal tax rates. For 2008, the difference between statutory and effective tax rates results from benefits from graduated federal tax rates offset by minimum taxes due in California versus taxable income.

The Company has elected to defer application of FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* in accordance with FASB Staff Position FIN 48-3, *Effective Date of Interpretation No. 48 for Certain Nonpublic Enterprises.* The Company has not prepared an accounting policy for evaluating uncertain tax positions since the Company is a non-public pass-through entity.

### NOTE 6.—CONCENTRATIONS

The Company maintains cash balances at various financial institutions which are insured by the Federal Deposit Insurance Corporation up to $250,000 and $100,000 on December 31, 2008 and December 31, 2007, respectively. At December 31, 2008 and 2007, the Organization had cash balances in financial institutions in excess of the FDIC insured amounts of approximately $187,437 and $993,397, respectively.

The majority of the Company's customers that comprise the seller finance portfolio are acquired from or developed with the assistance of various title companies. Business transacted under a private label agreement with one title company is 11% of the Company's total revenue.

### NOTE 7.—COMMITMENTS AND CONTINGENCIES

The Company is obligated under leases for office space in Washington, Oregon, Arizona, and Nevada expiring at various times through 2012. Subsequent to December 31, 2008, leases at two locations were restructured. Minimum future lease commitments, including the restructured leases, are as follows:

| Years ending December 31 | |
|---|---|
| 2009 | $  674,556 |
| 2010 | 565,441 |
| 2011 | 407,336 |
| 2012 | 393,268 |
| Thereafter | 0 |
| | $2,040,601 |

-15-

NOTEWORLD LLC AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
DECEMBER 31, 2008 AND 2007

## NOTE 7.--COMMITMENTS AND CONTINGENCIES (Continued)

The Company is involved in various legal proceedings and pending claims arising in the ordinary course of business. The final outcomes are uncertain; however, management does not expect the resolution of these matters to have a significant effect on the consolidated financial statements.

The Company provides payment processing to its customers nationwide through a servicing agreement. As the servicing agent, the Company is subject to various state regulatory capital and bonding requirements in connection with providing these services. Failure to maintain minimum capital and bonding requirements could result in the Company's inability to service seller-financed and personal accounts services contracts and, therefore, could have a direct material effect on the Company's financial statements.

Management believes, as of December 31, 2008, and as of December 31, 2007, the Company met all capital requirements to which it is subject. The Company's actual capital amounts and the minimum amounts required by any state for capital adequacy purposes are as follows.

December 31, 2008
  Member's capital

**Financial
Information
Redacted**

December 31, 2007
  Member's capital

The Company is also subject to bonding requirements established by each state in which they operate. Management believes as of December 31, 2008, that the Company meets all bonding requirements to which it is subject.

## NOTE 8.--TRUST ACCOUNTS AND TRUST ACCOUNT AUDITS

As described in Note 1, the Company is a payment processor for seller-financed real estate mortgages and individuals using the payment processing services. The Company remits those payments, less service fees, as appropriate, to creditors under the terms of the contracts. The payments are deposited in one of two separate trust accounts maintained by the Company.

The Company, as trustee, is responsible for managing significant trust cash on deposit. In addition, the Company is responsible to ensure the trusts comply with all applicable state and federal licensing and regulatory requirements throughout the jurisdictions in which they operate.

-16-

## NOTEWORLD LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
### DECEMBER 31, 2008 AND 2007

### NOTE 8.--TRUST ACCOUNTS AND TRUST ACCOUNT AUDITS (Continued)

At December 31, 2008 and 2007, the Company, as trustee, was responsible for managing total cash deposits held in trust in the amount of $72,902,504 and $66,396,264, respectively.

Certain jurisdictions require the Company to have an annual independent audit performed on the trust accounts.

### NOTE 9.--DEFINED CONTRIBUTION PLAN

The Company's 401(k) plan (the "Plan") covers eligible employees of NoteWorld and NoteWorld Financial LLC. All employees who work 1,000 hours or more per year and have attained the age of 21 are eligible to participate in the Plan. Under the Plan, eligible employees may contribute the statutory maximum. The Company currently matches employee contributions up to 6% of their salary at 50%. This matching percentage is at the Company's discretion and is subject to change at any time. The Company's matching contributions totaled $82,407 and $88,589 for the years ended December 31, 2008 and 2007, respectively.

### NOTE 10.--RELATED PARTY TRANSACTIONS

Former Parent Company

During the first eleven months of 2007, the Company received income and expense allocations from the former parent company. For the year ended December 31, 2007, the former parent allocated to the Company income in the amount of $1,598,365. In addition, the Company was allocated expense from the former parent of $565,000. These items are presented separately from income from operations since the intercompany relationship giving rise to the allocations ceased November 30, 2007.

In 2007, the former parent paid $1,186,362 in commission income to NoteWorld Financial LLC relating to the purchase of seller-financed notes. These amounts are included in commission income on the consolidated statements of income.

Subsequent to the acquisition by the new owner, the Company has not engaged in business transactions with the former parent.

## NOTEWORLD LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)
### DECEMBER 31, 2008 AND 2007

### NOTE 10.-RELATED PARTY TRANSACTIONS (Continued)

In connection with the purchase of the Company, the new member borrowed $1,000,000 to pay the former parent (the seller). The amount due from the member was noninterest bearing and had no stated maturity date and is reported as a reduction of member's equity on the consolidated balance sheet at December 31, 2007. During 2008 the receivable from member was satisfied via a noncash distribution to the member.

During 2008, a consulting company owned by the husband of the member provided consulting services to the Company in the amount of $40,000. There is no balance due on the transaction.

Fiduciary Trusts

As trustee for the personal account servicing and seller financing fiduciary trusts, the Company has advanced funds to the trusts to cover returned items deducted from the trusts' bank accounts. Advances outstanding at December 31, 2008 and 2007, amounted to $37,709 and $183,419, respectively, and are included in accounts receivable on the Company's consolidated balance sheets.

Since the trusts do not maintain operating cash accounts, the Company also pays all operating costs associated with the trusts, including licensing fees, bank fees, and all other costs. These costs are offset by service income and bank credits received by the Company on the trusts' cash deposits.

## NOTEWORLD LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENT OF INCOME
## FOR THREE QUARTERS ENDED SEPTEMBER 30, 2009

**REVENUE**
Servicing fees
Commission income
Other income

### TOTAL REVENUE

**EXPENSES**
Compensation, taxes and benefits
Notebuying transaction costs
Rent and utilities
Lockbox
Bonding and insurance
Advertising and promotion
Printing
Postage and delivery
Legal and other professional services
Office services and supplies
Taxes and licenses
Penalties, bad debts and other losses
Travel, meals and entertainment
Depreciation and amortization
Other general and administrative

Financial
Information
Redacted

### TOTAL EXPENSES

### INCOME FROM OPERATIONS

### DECREASE IN FAIR VALUE OF SERVICING RIGHTS

Financial
Information
Redacted

### NET INCOME

*Unaudited - Prepared By Management*

## NOTEWORLD LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEET
## SEPTEMBER 30, 2009

### ASSETS

**CURRENT ASSETS**
Cash
Accounts receivable
Prepaid expenses
Notes receivable, current portion
Servicing rights at fair value, current portion
**TOTAL CURRENT ASSETS**

**NOTES RECEIVABLE**

Financial
Information
Redacted

**LEASEHOLD IMPROVEMENTS, FURNITURE
AND EQUIPMENT, net**

**SERVICING RIGHTS at fair value**

**OTHER ASSETS**

**TOTAL ASSETS**

### LIABILITIES AND MEMBER'S EQUITY

**CURRENT LIABILITIES**
Lines of credit
Accounts payable and other current liabilities
**TOTAL CURRENT LIABILITIES**

Financial
Information
Redacted

**MEMBER'S EQUITY**

**TOTAL LIABILITIES AND MEMBER'S EQUITY**

*Unaudited - Prepared By Management*

# Exhibit 4

# NoteWorld
## Servicing Center

# Memberships and Organizations

American Institute of Certified Public Accountants
(AICPA)
POBox 10069
Newark, NJ 07101-3069
(888)777-7077
**Membership 2008 – 2009**
Business Purpose: Company
Affiliate Member: Roger Vester

American Land Title Association (ALTA)
PO BOX 17429
Baltimore, MD 21291
(800)787-2582
**Membership:  2008 – 2009**
Business Purpose: Seller Finance Servicing
Affiliate Member: Linda Remsberg

American Escrow Association
211 North Union Street, Ste 100
Alexandria, VA 22314
(703)519-1240
**Membership: 7/2009-7/2010**
Business Purpose: Seller Finance Servicing
Affiliate Member: Gloria Greeley

Association of Washington Business
PO Box 658
Olympia, WA 98507-0658
(800)521-9325
**Membership: 2008 – 2009**
Business Purpose: Company
Affiliate Member: Linda Remsberg

Bend Chamber of Commerce
777 NorthWest Wall Street Ste 200
Bend, OR 97701
(541)382-3221
**Membership: 6/2009 – 5/2010**
Business Purpose: Personal Account Servicing
Affiliate Member: Dodie Apperson

BBB - Central, Northern & Western Arizona
4428 N. 12th Street
Phoenix AZ 85014-4585
(602) 264-1721 / Fax: (602) 263-0997
http://central-northern-western-arizona.bbb.org
info@arizonabbb.org
**Membership: 11/2008 – 11/2009**
Business Purpose: Noteworld Servicing Center
Affiliate Member: Linda Remsberg

BBB – Northern California
3075 Beacon Blvd. West
Sacramento, CA 95691
(916)443-6668
**Membership: 2009-2010**
Business Purpose: Company
Affiliate Member: Karen Lago

BBB – Alaska, Oregon & Western Washington
PoBox 100
Dupont, WA 98327
(888)948-2227
**Membership: 6/2009 – 5/2010**
Business Purpose: NoteWorld Servicing, Bend
Affiliate Member: Linda Remsberg

Benson Marketing Group
5003 Honey Suckle Blvd
Columbus, OH 43230
(866)520-2247
**Membership 2008 – 2009**
Business Purpose: Marketing
Affiliate Member: Karen Lago

Central Oregon Real Estate Investment (COREIC)
Contact: Judie McClurg
250 NorthWest Franklin Ave Ste 401
Bend, OR 97701
(541)317-9177 X322
**Membership: 2008 – 2009**
Business Purpose: Seller Finance Servicing
Affiliate Member: Michelle O'Connor

Douglas Association of Realtors
C/O Abbott Realty, LTD
515 E. 10th Street
Douglas, AZ  85607
(520) 236-1175 / Fax: (520) 364-2131
Eidha Contreras-Chin, President
C21@abbott@aol.com
**Membership: 2008 - 2009**
Business Purpose: Noteworld Servicing Center
Affiliate Member: Karin Phillips, Sierra Vista

Escrow Association of Washington
PoBox 1850
Milton, WA 98354
(253)864-3537
**Membership: 7/2009 – 7/2010**
Business Purpose: Seller Finance Servicing
Affiliate Member: Gloria Greeley

Eugene Area Chamber of Commmerce, INC.
PoBox 1107
Eugene, OR 97440
(541)484-1314
**Membership: 7/2009 – 7/2010**
Business Purpose: Seller Finance Servicing
Affiliate Member: Cindy Fletcher

Grants Pass Jo. Co. Chamber of Commerce
1995 NorthWest Vine Street
Grants Pass, OR 97528
(541)476-7717
**Membership: 5/2009 – 4/2010**
Business Purpose: Seller Finance Servicing
Affiliate Member: Cindy Fletcher

Kingman Area Chamber of Commerce
1858 Golden Gate
Kingman, AZ 86401
(928)718-5858
**Membership: 5/2009-4/2010**
Business Purpose: Seller Finance Operations
Affiliate Member: Kathy Chastain-Ferguson

Kingman/Golden Valley Association of Realtors
1923 Kino Ave.
Kingman, AZ 86409-3063
(928)692-3222
**Membership: 2009**
Business Purpose: Seller Finance Servicing
Affiliate Member: Charlene Macko & Kathry Ferguson

Land Title Association of Arizona (LTAA)
7225 W. Oakland Street
Chandler, AZ 85226-2466
(480)496-4465
**Membership: 2009**
Business Purpose: Seller Finance Servicing
Affiliate Member: Charlene Macko

Northwest Clearing House Association (NWCHA)
*Regional Sub-group to NACHA*
1800 NW Market Street, Suite 201
Seattle, WA 98107
(206) 622-7846 / (206) 622-3197 FAX
info@nwcha.org / www.nwcha.org
**Membership: 2009**
Affiliate Member: Chris Pefley

Oregon Escrow Council (CCOEC) Central Chapter
320 SE Upper Terrace Drive, Ste 102
Bend, OR 97702
541-722-8364
**Membership 4/2009 – 4/2010**
Business Purpose: Seller Finance Servicing
Affiliate Member: Cynthia Fletcher

Project Management Institute
PO Box 360001
Ft Lauderdale, FL 33336-0001
(800)528-2122
**Membership: 2008 – 2009**
Business Purpose: Technology
Affiliate Member: Jake Fournier

Rental Housing Association of Puget Sound
529 Warren Avenue North
Seattle, WA 98109-4527 USA
Phone:  (206) 283-0816
Fax: (206) 286-9461
Toll Free:  800 335-2990
**Membership: 4/2009-3/2010**
Business Purpose: Corportale Marketing
Affiliate Member: Bard Luippold

Society for Human Resouce Management
1800 Duke Street
Alexandria, Virginia 22314 USA
Phone US Only: (800) 283-SHRM
**Membership: 6/2009-5/2010**
Business Purpose: Corporate HR
Affiliate Member: Deneen Grant

South Sound Escrow Association (Escrow
Association of Washington)
PoBox 1850
Milton, WA 98354
**Membership: 7/2009-7/2010**
Business Purpose: Seller finance Servicing
Affiliate Member: Gloria Greeley

Tacoma / Pierce County Association of Realtors
2550 South Yakima Ave, Ste C
Tacoma, WA 98405
(253)473-0232
**Membership: 1/2009-1/2010**
Business Purpose: Company
Affiliate Member: Doug Bertram

Tacoma/Pierce County Chamber of Commerce
PoBox 1933, Tacoma, WA 98401-1933
(253)627-2175
**Membership: 3/2009 – 2/2010**
Business Purpose: Company
Affiliate Member: Amanda Hobbs

The Association of Settlement Companies (TASC)
16 North Carroll Street, Ste 900, Madison, WI 53703
(608)512-1207
**Membership: 1/2008 – 12/2009**
Business Purpose: Personal Account Servicing
Affiliate Member: Dodie Apperson

United States Organization for Bankruptcy
Alternatives (USOBA)
5405 F.T.C Jester Blvd #3310
Houston, TX 77091
(281)820-0666
**Membership: 2009**
Business Purpose: Personal Account Servicing
Affiliate Member: Dodie Apperson

Washington Policy Center
Contact: Katie Bering
4025 Delridge Way SouthWest, Ste 210
Seattle, WA 98106
(206)937-9691
**Membership: Recurring**
Business Purpose: Company
Affiliate Member: Linda Remsberg

World At Work
14040 N. Northsight Blvd.
Scottsdale, AZ 85260
**Membership:  10/2009**
Business Purpose:  Corporate HR
Affiliate Member:  Deneen Grant

# Exhibit 5

## KANSAS

On or about November 5, 2008, NoteWorld received notice from the Kansas Office of the State Bank Commissioner ("OBC") of its intent to conduct a routine off-site examination of the company. The OBC is the regulatory body that enforces the Kansas Mortgage Business Act, pursuant to which NoteWorld holds a license. The OBC requested documentation for the period October 2006 – October 2008. On November 18, 2008, the OBC requested additional information and documentation from NoteWorld in its ongoing examination of the company. At all times during the examination period, NoteWorld complied with the OBC's requests and timely delivered all documentation.

On or about May 14, 2009, the OBC sent NoteWorld a copy of the February 26, 2009 Report of Examination ("Report"). The Report reflected one violation, namely that NoteWorld charged servicing fees to six consumers that exceeded the contractual amount. NoteWorld was directed to issue refunds to those consumers in the amount of the overpayment, totaling $1,897.77. NoteWorld promptly sent refunds to the six affected consumers. The OBC took no further action against NoteWorld; did not levy any other fines or penalties against NoteWorld; and, no lawsuit, charge or other legal proceeding was brought against NoteWorld. NoteWorld believes the matter has been resolved to the full satisfaction of the OBC.

## CONNECTICUT

On November 21, 2007, NoteWorld filed its Certificate of Registration with the Connecticut Secretary of State. The Connecticut Secretary of the State served Secretary of State's Interrogatories to Limited Liability Company on NoteWorld via a letter, dated January 2, 2008. The Interrogatories were sent based on a claim that NoteWorld may have transacted business in the State of Connecticut as a foreign limited liability company without a certificate of registration. NoteWorld submitted its responses to Interrogatories to the Connecticut Secretary of State on February 1, 2008. On February 15, 2008, NoteWorld was notified by the CT Attorney General that a determination had been made that NoteWorld had transacted business in Connecticut prior to its registration with the Secretary of State as a foreign entity. However, because NoteWorld had shown good faith in its efforts to comply and in responding to the interrogatories, the Attorney General reduced the mandatory penalty it imposed on NoteWorld from $9,570 to $4,785. NoteWorld issued a check to the Connecticut Secretary of State. Subsequently, on March 6, 2008, the Connecticut Department of Banking issued a Money Transmitter License to NoteWorld. NoteWorld remains in good standing with the Secretary of State.

## FLORIDA

The Florida Office of Financial Regulation ("OFR") sent a letter to NoteWorld, dated March 26, 2007, announcing that it had scheduled a routine examination of the business related to NoteWorld's Florida Mortgage Lender license as that term is defined by Florida law. The period under examination was from April 30, 2004, through March 31, 2007. On or about May 2, 2007, NoteWorld provided the OFR with the documents and

information it had requested. Over the following months, NoteWorld promptly responded to all of the OFR's requests for supplemental information. NoteWorld sent the last of the requested information to the OFR on or about January 29, 2008. On February 20, 2008, the OFR provided its examination findings to which NoteWorld responded on March 5, 2008. Ultimately, the OFR found that NoteWorld had failed to maintain the minimum net worth required for a mortgage lender for the years ending December 31, 2003, and December 31, 2004. On July 22, 2008, NoteWorld entered into a Stipulation and Consent Agreement whereby it agreed to (1) cease and desist from future violations of the Florida law; (2) pay a reduced administrative fine of $2,000; and (3) a probationary period of one year. The OFR did not levy any other fines or penalties against NoteWorld, and no lawsuit, charge or other legal proceeding were brought against NoteWorld. NoteWorld has been fully compliant with the Florida law at all times thereafter.

## WASHINGTON

Prior to seeking a Washington Money Transmitter license, NoteWorld was conducting business in Washington under the belief that its activities fell within the scope of its Washington Escrow Agent license. NoteWorld has been licensed as an Escrow Agent by the Washington Department of Financial Institutions since December 27, 2000 (License #540-EA-0088-00 issued to Wynwood Agency, Inc. followed by the current License #540-EA-18754 issued to Wynwood Agency, Inc. on December 20, 2001). When NoteWorld was purchased by Linda Remsberg in November 2007, Ms. Remsberg directed a legal review of NoteWorld's licensing in the states in which it conducts business. As part of that review, state money transmitter laws were evaluated. Ultimately, a decision was made to pursue states' money transmitter licenses, in part, to provide a foundation for future growth and diversification.

NoteWorld submitted its Money Transmitter license application to the State of Washington Department of Financial Institutions ("DFI") on August 5, 2008. Subsequently, the DFI notified NoteWorld that it believed some of its prior business activities fell within the scope of Washington's Money Transmitter laws and therefore, NoteWorld had conducted unlicensed money transmission activity in the state. On January 6, 2009, the DFI provided NoteWorld with a form of Consent Order that requires NoteWorld to pay a fine for the unlicensed activity in the amount of $1,500, plus the DFI's investigation fees of $375. The Consent Order was entered by the DFI on January 14, 2009. On January 30, 2009, the DFI issued a Washington Money Transmitter license to NoteWorld.

## OHIO

Prior to seeking an Ohio Money Transmitter license, NoteWorld was conducting business in Ohio under the belief that its activities were more akin to "escrow" activities and therefore, outside the scope of the Ohio Money Transmitter laws. When NoteWorld was purchased by Linda Remsberg in November 2007, Ms. Remsberg directed a legal review of NoteWorld's licensing in the states in which it conducts business. As part of that

review, state money transmitter laws were evaluated. Ultimately, a decision was made to pursue states' money transmitter licenses, in part, to provide a foundation for future growth and diversification.

NoteWorld submitted its Money Transmitter license application to the State of Ohio Division of Financial Institutions ("DFI") on or about October 29, 2008. Subsequently, the DFI notified NoteWorld that it believed some of its prior business activities fell within the scope of Ohio's Money Transmitter laws and therefore, NoteWorld had conducted unlicensed money transmission activity in the state. On March 24, 2009, the DFI provided NoteWorld with a Stipulation and Consent to the Issuance of an Order of Civil Penalty and Order of Civil Penalties that requires NoteWorld to pay a civil penalty for the unlicensed activity. NoteWorld has executed the Stipulation and returned it, along with the penalty in the reduced amount of $6,000, to the DFI. NoteWorld was granted its Ohio Money Transmitter license on April 21, 2009.

## NEW HAMPSHIRE

In approximately June 2007, the New Hampshire Banking Department ("Department") advised NoteWorld that it considered certain activities being conducted by NoteWorld to be that of a Money Transmitter. Discussions between NoteWorld's attorneys (an outside law firm that had been retained to handle this matter) and the Department continued until approximately September 2007. During that time, NoteWorld and the Department agreed to an exit strategy that gave NoteWorld time to discontinue providing money transmission services to New Hampshire consumers until such time as NoteWorld was properly licensed. NoteWorld has not provided any money transmitter services for New Hampshire consumers since September 2007.

NoteWorld submitted its Money Transmitter license application to the Department on June 23, 2008. Over the ensuing months, NoteWorld promptly responded to all of the Department's requests for supplemental information. NoteWorld sent the last of the requested information to the Department on or about July 10, 2009. On or about July 21, 2009, the Department sent NoteWorld a form of Consent Order setting forth its findings regarding prior unlicensed business activities in the state, levying penalties against NoteWorld and directing certain consumer refunds. The Consent Order was entered by the Department on August 4, 2009. On August 4, 2009, the Department also issued a New Hampshire Money Transmitter license to NoteWorld.

## NORTH DAKOTA

NoteWorld submitted its Money Transmitter license application to the North Dakota Department of Financial Institutions ("DFI") on September 23, 2009. On October 19, 2009, NoteWorld received a certified letter from the DFI enclosing an Order Imposing Civil Money Penalties, and Notice of Opportunity for Hearing ("Order") entered by the DFI on October 13, 2009. The Order set forth the DFI's findings regarding NoteWorld's prior unlicensed business activities in the state and imposing against NoteWorld a civil

money penalty of $2,500.  On October 19, 2009, NoteWorld remitted the full amount of the civil money penalty to the DFI.  NoteWorld fully anticipates that the DFI will issue a Money Transmitter license to NoteWorld in due course.



36. Do you currently carry the following:

(b)    Surety Bond?                          $\underline{X}$  Yes              __ No
If "Yes," please complete the following:

See attached

Revised 11/13/09

# NoteWorld LLC's Surety Bonds as of 11/13/09

| State Bond | Carrier | Bond # | Effective Date | End Date | Limit | Deductible | Premium |
|---|---|---|---|---|---|---|---|
| Alabama | Platte River | 41180191 | 7/24/2009 | 7/24/2010 | $ 10,000 | $0.00 | $ 200 |
| Alaska | Platte River | 41180210 | 8/5/2009 | 8/5/2010 | $ 30,000 | $0.00 | $ 600 |
| Arizona | Fidelity | 8935314 | 11/29/2009 | 11/29/2009 | $ 100,000 | $0.00 | $ 2,000 |
| Arkansas | Westchester | K07931372 | 11/30/2009 | 11/30/2010 | $ 150,000 | $0.00 | $ 3,000 |
| Colorado | Fidelity | 8935306 | 8/6/2009 | 8/6/2010 | $ 1,000,000 | $0.00 | $ 20,000 |
| Connecticut | Fidelity | 8935315 | 11/1/2009 | 11/1/2010 | $ 300,000 | $0.00 | $ 6,025 |
| DC | Platte River | 41186148 | 10/19/2009 | 10/19/2010 | $ 60,000 | $0.00 | $ 1,200 |
| Delaware | Platte River | 41180316 | 9/21/2009 | 9/21/2010 | $ 30,000 | $0.00 | $ 600 |
| Florida | Platte River | 41167020 | 2/1/2009 | 2/1/2010 | $ 300,000 | $0.00 | $ 6,000 |
| Florida | Westchester | K07931098 | 11/2/2009 | 11/2/2010 | $ 10,000 | $0.00 | $ 200 |
| Hawaii | Platte River | 41180155 | 7/9/2009 | 7/9/2010 | $ 1,000 | $0.00 | $ 150 |
| Idaho | Platte River | 41180203 | 8/3/2009 | 8/3/2010 | $ 15,000 | $0.00 | $ 300 |
| Idaho | Westchester | K07931335 | 11/30/2009 | 11/30/2010 | $ 50,000 | $0.00 | $ 1,000 |
| Illinois | Westchester | K07930094A | 12/31/2009 | 12/31/2009 | $ 2,000,000 | $0.00 | $ 40,000 |
| Illinois | Westchester | K07930975 | 11/30/2009 | 11/30/2010 | $ 20,000 | $0.00 | $ 400 |
| Iowa | Platte River | 41167053 | 3/1/2009 | 3/1/2010 | $ 60,000 | $0.00 | $ 1,200 |
| Kansas | Platte River | 41180154 | 7/15/2009 | 7/15/2010 | $ 200,000 | $0.00 | $ 4,000 |
| Kansas | Westchester | K07931517 | 9/1/2009 | 9/1/2010 | $ 100,000 | $0.00 | $ 2,000 |
| Kentucky | Platte River | 41186147 | 10/19/2009 | 10/19/2010 | $ 500,000 | $0.00 | $ 10,000 |
| Louisiana | Platte River | 41167088 | 3/20/2009 | 3/20/2010 | $ 350,000 | $0.00 | $ 7,000 |
| Louisiana | Westchester | K07931293 | 11/30/2009 | 11/30/2010 | $ 115,000 | $0.00 | $ 2,300 |
| Maine | Platte River | 41180190 | 7/24/2009 | 12/31/2010 | $ 100,000 | $0.00 | $ 2,706 |
| Maryland | Fidelity | 8935326 | 1/1/2010 | 1/1/2011 | $ 750,000 | $0.00 | $ 15,000 |
| Michigan | Westchester | K07931256 | 12/31/2009 | 12/31/2010 | $ 125,000 | $0.00 | $ 2,709 |
| Michigan | Westchester | K07931578 | 12/31/2009 | 12/31/2010 | $ 500,000 | $0.00 | $ 10,000 |
| Minnesota | Westchester | K07931219 | 7/1/2009 | 6/30/2010 | $ 20,000 | $0.00 | $ 400 |
| Minnesota | Platte River | 41167031 | 12/31/2009 | 12/31/2010 | $ 25,000 | $0.00 | $ 500 |
| Mississippi | Westchester | K07931177 | 11/30/2009 | 12/31/2010 | $ 150,000 | $0.00 | $ 3,000 |
| Mississippi | Platte River | 41174171 | 5/5/2009 | 5/5/2010 | $ 25,000 | $0.00 | $ 500 |
| Missouri | Westchester | K07930860 | 10/10/2009 | 10/10/2010 | $ 400,000 | $0.00 | $ 8,000 |
| Montana | Westchester | K07931134 | 11/30/2009 | 11/30/2010 | $ 100,000 | $0.00 | $ 2,000 |

Revised 11/13/09

| Nevada | Platte River | 41174170 | 5/5/2009 | 5/5/2010 | $ 10,000 | $0.00 | $ 200 |
|---|---|---|---|---|---|---|---|
| New Hampsire | Fidelity | 8935323 | 11/30/2009 | 11/30/2010 | $ 100,000 | $0.00 | $ 2,000 |
| New Jersey | Fidelity | 8935317 | 11/30/2009 | 11/30/2010 | $ 100,000 | $0.00 | $ 2,000 |
| New York | Fidelity | 8935347 | 7/1/2009 | 7/1/2010 | $ 500,000 | $0.00 | $ 10,000 |
| New York | Platte River | 41180317 | 9/21/2009 | 9/21/2010 | $ 250,000 | $0.00 | $ 5,000 |
| North Carolina | Platte River | 41167067 | 3/5/2009 | 3/5/2010 | $ 150,000 | $0.00 | $ 3,000 |
| North Dakota | Platte River | 41180314 | 9/21/2009 | 9/21/2010 | $ 150,000 | $0.00 | $ 3,000 |
| Ohio | Fidelity | 8935340 | 4/1/2009 | 4/1/2010 | $ 300,000 | $0.00 | $ 6,000 |
| Oklahoma | Platte River | 41167077 | 3/23/2009 | 3/23/2010 | $ 50,000 | $0.00 | $ 1,000 |
| Oregon | Westchester | K07931013 | 11/30/2009 | 11/30/2010 | $ 500,000 | $0.00 | $ 10,000 |
| Pennsylvania | Fidelity | 8935304 | 6/27/2009 | 6/27/2010 | $ 1,000,000 | $0.00 | $ 20,000 |
| Rhode Island | Platte River | 41174262 | 6/23/2009 | 6/23/2010 | $ 50,000 | $0.00 | $ 1,000 |
| South Dakota | Platte River | 41180209 | 8/5/2009 | 8/5/2010 | $ 100,000 | $0.00 | $ 2,000 |
| Tennessee | Westchester | K07930902 | 9/22/2009 | 9/22/2010 | $ 60,000 | $0.00 | $ 1,200 |
| Texas | Fidelity | 8935318 | 11/30/2009 | 11/30/2011 | $ 300,000 | $0.00 | $ 10,500 |
| Utah | Platte River | 41174261 | 6/23/2009 | 6/23/2010 | $ 50,000 | $0.00 | $ 1,000 |
| Vermont | Platte River | 41180315 | 9/21/2009 | 9/21/2010 | $ 100,000 | $0.00 | $ 2,000 |
| Virginia | Platte River | 41180261 | 8/27/2009 | 8/27/2010 | $ 25,000 | $0.00 | $ 500 |
| Washington | Westchester | K07930896 | 11/30/2009 | 11/30/2010 | $ 10,000 | $0.00 | $ 200 |
| Washington | Fidelity | 8935316 | 11/30/2009 | 11/30/2010 | $ 60,000 | $0.00 | $ 1,200 |
| West Virginia | Platte River | 41167087 | 3/20/2009 | 3/20/2010 | $ 300,000 | $0.00 | $ 5,889 |
| West Virginia | Westchester | K07930938 | 11/30/2008 | 11/30/2010 | $ 5,000 | $0.00 | $ 200 |
| Wyoming | Platte River | 41186149 | 10/19/2009 | 10/19/2010 | $ 300,000 | $0.00 | $ 6,000 |

Total   $ 12,166,000   $0.00   $ 248,879

# Exhibit 7

## KANSAS

On or about November 5, 2008, NoteWorld received notice from the Kansas Office of the State Bank Commissioner ("OBC") of its intent to conduct a routine off-site examination of the company. The OBC is the regulatory body that enforces the Kansas Mortgage Business Act, pursuant to which NoteWorld holds a license. The OBC requested documentation for the period October 2006 – October 2008. On November 18, 2008, the OBC requested additional information and documentation from NoteWorld in its ongoing examination of the company. At all times during the examination period, NoteWorld complied with the OBC's requests and timely delivered all documentation.

On or about May 14, 2009, the OBC sent NoteWorld a copy of the February 26, 2009 Report of Examination ("Report"). The Report reflected one violation, namely that NoteWorld charged servicing fees to six consumers that exceeded the contractual amount. NoteWorld was directed to issue refunds to those consumers in the amount of the overpayment, totaling $1,897.77. NoteWorld promptly sent refunds to the six affected consumers. The OBC took no further action against NoteWorld; did not levy any other fines or penalties against NoteWorld; and, no lawsuit, charge or other legal proceeding was brought against NoteWorld. NoteWorld believes the matter has been resolved to the full satisfaction of the OBC.

## CONNECTICUT

On November 21, 2007, NoteWorld filed its Certificate of Registration with the Connecticut Secretary of State. The Connecticut Secretary of the State served Secretary of State's Interrogatories to Limited Liability Company on NoteWorld via a letter, dated January 2, 2008. The Interrogatories were sent based on a claim that NoteWorld may have transacted business in the State of Connecticut as a foreign limited liability company without a certificate of registration. NoteWorld submitted its responses to Interrogatories to the Connecticut Secretary of State on February 1, 2008. On February 15, 2008, NoteWorld was notified by the CT Attorney General that a determination had been made that NoteWorld had transacted business in Connecticut prior to its registration with the Secretary of State as a foreign entity. However, because NoteWorld had shown good faith in its efforts to comply and in responding to the interrogatories, the Attorney General reduced the mandatory penalty it imposed on NoteWorld from $9,570 to $4,785. NoteWorld issued a check to the Connecticut Secretary of State. Subsequently, on March 6, 2008, the Connecticut Department of Banking issued a Money Transmitter License to NoteWorld. NoteWorld remains in good standing with the Secretary of State.

## FLORIDA

The Florida Office of Financial Regulation ("OFR") sent a letter to NoteWorld, dated March 26, 2007, announcing that it had scheduled a routine examination of the business related to NoteWorld's Florida Mortgage Lender license as that term is defined by Florida law. The period under examination was from April 30, 2004, through March 31, 2007. On or about May 2, 2007, NoteWorld provided the OFR with the documents and

information it had requested.  Over the following months, NoteWorld promptly responded to all of the OFR's requests for supplemental information.  NoteWorld sent the last of the requested information to the OFR on or about January 29, 2008.  On February 20, 2008, the OFR provided its examination findings to which NoteWorld responded on March 5, 2008.  Ultimately, the OFR found that NoteWorld had failed to maintain the minimum net worth required for a mortgage lender for the years ending December 31, 2003, and December 31, 2004.  On July 22, 2008, NoteWorld entered into a Stipulation and Consent Agreement whereby it agreed to (1) cease and desist from future violations of the Florida law; (2) pay a reduced administrative fine of $2,000; and (3) a probationary period of one year.  The OFR did not levy any other fines or penalties against NoteWorld, and no lawsuit, charge or other legal proceeding were brought against NoteWorld.  NoteWorld has been fully compliant with the Florida law at all times thereafter.

## WASHINGTON

Prior to seeking a Washington Money Transmitter license, NoteWorld was conducting business in Washington under the belief that its activities fell within the scope of its Washington Escrow Agent license.  NoteWorld has been licensed as an Escrow Agent by the Washington Department of Financial Institutions since December 27, 2000 (License #540-EA-0088-00 issued to Wynwood Agency, Inc. followed by the current License #540-EA-18754 issued to Wynwood Agency, Inc. on December 20, 2001).  When NoteWorld was purchased by Linda Remsberg in November 2007, Ms. Remsberg directed a legal review of NoteWorld's licensing in the states in which it conducts business.  As part of that review, state money transmitter laws were evaluated.  Ultimately, a decision was made to pursue states' money transmitter licenses, in part, to provide a foundation for future growth and diversification.

NoteWorld submitted its Money Transmitter license application to the State of Washington Department of Financial Institutions ("DFI") on August 5, 2008.  Subsequently, the DFI notified NoteWorld that it believed some of its prior business activities fell within the scope of Washington's Money Transmitter laws and therefore, NoteWorld had conducted unlicensed money transmission activity in the state.  On January 6, 2009, the DFI provided NoteWorld with a form of Consent Order that requires NoteWorld to pay a fine for the unlicensed activity in the amount of $1,500, plus the DFI's investigation fees of $375.  The Consent Order was entered by the DFI on January 14, 2009.  On January 30, 2009, the DFI issued a Washington Money Transmitter license to NoteWorld.

## OHIO

Prior to seeking an Ohio Money Transmitter license, NoteWorld was conducting business in Ohio under the belief that its activities were more akin to "escrow" activities and therefore, outside the scope of the Ohio Money Transmitter laws.  When NoteWorld was purchased by Linda Remsberg in November 2007, Ms. Remsberg directed a legal review of NoteWorld's licensing in the states in which it conducts business.  As part of that

review, state money transmitter laws were evaluated.  Ultimately, a decision was made to pursue states' money transmitter licenses, in part, to provide a foundation for future growth and diversification.

NoteWorld submitted its Money Transmitter license application to the State of Ohio Division of Financial Institutions ("DFI") on or about October 29, 2008.  Subsequently, the DFI notified NoteWorld that it believed some of its prior business activities fell within the scope of Ohio's Money Transmitter laws and therefore, NoteWorld had conducted unlicensed money transmission activity in the state.  On March 24, 2009, the DFI provided NoteWorld with a Stipulation and Consent to the Issuance of an Order of Civil Penalty and Order of Civil Penalties that requires NoteWorld to pay a civil penalty for the unlicensed activity.  NoteWorld has executed the Stipulation and returned it, along with the penalty in the reduced amount of $6,000, to the DFI.  NoteWorld was granted its Ohio Money Transmitter license on April 21, 2009.


## NEW HAMPSHIRE

In approximately June 2007, the New Hampshire Banking Department ("Department") advised NoteWorld that it considered certain activities being conducted by NoteWorld to be that of a Money Transmitter.  Discussions between NoteWorld's attorneys (an outside law firm that had been retained to handle this matter) and the Department continued until approximately September 2007.  During that time, NoteWorld and the Department agreed to an exit strategy that gave NoteWorld time to discontinue providing money transmission services to New Hampshire consumers until such time as NoteWorld was properly licensed.  NoteWorld has not provided any money transmitter services for New Hampshire consumers since September 2007.

NoteWorld submitted its Money Transmitter license application to the Department on June 23, 2008.  Over the ensuing months, NoteWorld promptly responded to all of the Department's requests for supplemental information.  NoteWorld sent the last of the requested information to the Department on or about July 10, 2009.  On or about July 21, 2009, the Department sent NoteWorld a form of Consent Order setting forth its findings regarding prior unlicensed business activities in the state, levying penalties against NoteWorld and directing certain consumer refunds.  The Consent Order was entered by the Department on August 4, 2009.  On August 4, 2009, the Department also issued a New Hampshire Money Transmitter license to NoteWorld.

## NORTH DAKOTA

NoteWorld submitted its Money Transmitter license application to the North Dakota Department of Financial Institutions ("DFI") on September 23, 2009.  On October 19, 2009, NoteWorld received a certified letter from the DFI enclosing an Order Imposing Civil Money Penalties, and Notice of Opportunity for Hearing ("Order") entered by the DFI on October 13, 2009.  The Order set forth the DFI's findings regarding NoteWorld's prior unlicensed business activities in the state and imposing against NoteWorld a civil

money penalty of $2,500.  On October 19, 2009, NoteWorld remitted the full amount of the civil money penalty to the DFI.  NoteWorld fully anticipates that the DFI will issue a Money Transmitter license to NoteWorld in due course.

# Exhibit 8

### Danielle H. Kiersztyn

Current Position:        **Secretary and General Counsel**
                         NoteWorld LLC
                         1001 Pacific Avenue, Suite 200
                         Tacoma, WA  98402

Danielle Kiersztyn, General Counsel, joined NoteWorld in May 2008 with a great deal of experience not only in legal services, but specifically in the financial services and payment processing industry. Before joining NoteWorld, Ms. Kiersztyn's work focused on licensing, compliance, and working with regulators and bonding agents -- a perfect alignment for Personal Account Servicing and Seller Finance.

As General Counsel, Ms. Kiersztyn is responsible for a wide range of legal support requiring a thorough understanding of the laws and regulations relating to the services that NoteWorld provides.  She also develops and provides analysis on policy and compliance issues, and anticipates and guards against legal risks facing the company.

Prior to joining NoteWorld, Ms. Kiersztyn was employed by Debt Free Financial Systems, L.L.C. where she was one of two attorneys in an in-house legal department charged with providing a myriad of legal services to a family of seven companies engaged in a broad range of businesses that collectively generated up to $50 million in annual revenues.

**James B. Pizl**

Current Position:     **Chief Financial Officer**
                      NoteWorld LLC
                      1001 Pacific Avenue, Suite 200
                      Tacoma, WA  98402

Jim Pizl, Chief Financial Officer, joined NoteWorld in May of 2007 and is responsible for managing the corporate accounting staff and functions including the balancing and reconciliation of NoteWorld's trust accounts. He also manages all independent CPA audits and audits by government regulators. Since joining the company Jim has played an important role in streamlining trust accounting processes and measurement tools.

Prior to joining NoteWorld Mr. Pizl was self-employed in the retail service industry.  In addition to his responsibilities as President and CEO of a multi-location entity, he also handled the financial management functions including development of monthly and quarterly financial statements, financial forecasts and budgets. He also managed general accounting functions including AR/AP, account reconciliation, and cash management.  Early in his career Mr. Pizl worked for the State of Washington Department of Revenue as a Revenue Auditor, managing and executing compliance audits for companies of all sizes.  He also worked as a member of the Department's Information Technology staff where he developed the software system auditors still use today to streamline audits.

Mr. Pizl holds a Juris Doctor degree from Seattle University School of Law and a Bachelor of Science degree in Accounting from Central Washington University.  He is licensed to practice law and public accounting in Washington.

## Stateside Underwriting Agency, Inc.
## Lending Supplemental Application

Instructions: Please complete the questions below for Sub Prime Loans. Where exact numbers are not available, please provide the Applicant's best estimate for the question asked. If information is not available, please mark "N/A".

Sub Prime Loan Definition: For the purposes of completing this application, Sub Prime Loans are generally deemed to be "B" quality loans or less that the Applicant can identify but should at a minimum include loans underwritten with a FICO score less than 620; Sub Prime Loans are thus to include any loans with FICO scores less than 620 and also any known sub prime loans of "B" quality or less (note some of these sub prime loans may have a FICO score higher than 619 and should be included). If the Applicant makes no Sub Prime Loans or makes no loans with FICO scores of less than 620, please complete only the following: the Applicant Name, Question "1", and signature section.

Applicant Name: NoteWorld LLC; NoteWorld Company, Inc.; NoteWorld Washington, Inc
        NoteWorld California, Inc., NoteWorld Financial LLC; NoteWorld Servicing Systems In

1. Estimated percentage of total loan origination that is Sub Prime (based on the definition above): ____0____% **We are not a lender; we do not originate loans of any kind.**

If question 1 is answered "zero", go to the end of the application. Read the signature section and sign and date it. The application is complete. If the answer to question 1 is anything other than "zero", complete the remainder of this supplemental application.

2. Total Sub Prime Loans Originated (including purchased loans) in the past twelve months
        Past 12 months        $_____        # of Loans_____
        Projected next 12 months    $_____        # of Loans_____

Please advise when answering questions 3 through 10 if a material change (more than 20%) in the answer to the question is expected during the next twelve months)

3. Approximate Loan to Value breakdown for Sub Prime Loans by percentage:

| | |
|---|---|
| +100% LTV | ____% |
| No Down payment | ____% |
| LTV +95-99% | ____% |
| LTV +90-95% | ____% |
| LTV +85%-90% | ____% |
| LTV 85% or less | ____% |
| | 100% Total |

4. Type of Sub Prime Loans by percentage

| | |
|---|---|
| Fixed Rate Loans | ____% |
| ARMS | ____% |

5. Please state the percentage of any Sub Prime ARM Loans with <u>monthly</u> adjustment features)      _____%

6. Other categories (note this column can total more than 100% as some categories may overlap with others, but only answer for Sub Prime Loans here):

| | |
|---|---|
| A. Interest Only Loans | _____% |
| B. New homes loans in a development | _____% |
| C. Spec Homes | _____% |
| D. Are <u>not</u> owner occupied | _____% |
| E. Refinance Loans | _____% |
| F. Percentage of ARM Loans where | |
| Applicant only has to qualify at initial payment level _____% | |
| G. Second Mortgage/HELOCs | _____% |
| H. No Doc/Low Doc Loans | _____% |

7. Indicate the percentage of loans with FICO scores in each range for the Applicants <u>Sub Prime Loans</u>:

| | |
|---|---|
| a. FICO scores above 619 | _____% |
| b. FICO score ranges from 580-619 | _____% |
| c. FICO score ranges from 550-579 | _____% |
| d. FICO score is less than 550 | _____% |

8. What percentage of Sub Prime Loans are sold <u>without</u> recourse? _____%

9. What approximate percentage of Sub Prime Loans are made <u>without</u> escrows set up for real estate taxes, insurance or other impounds? _____%

10. On No Doc or Low Documentation Loans, please provide an estimate of the Loan to Value Ratio of those loans made in the last twelve months: _____%

11. Please describe procedures used to limit the exposure to predatory lending claim allegations for the Sub Prime Loans being originated (disclosures such as rate adjustment disclosures, counseling on adjustments expected, etc.)

_____

_____


12. Have any claims involving sub prime loans been made against the Applicant?

      Yes____ No____

If yes, please provide details of such and any corrective actions taken to prevent future claims for such:

_____

_____

The undersigned authorized person, on behalf of the applicant, attest that all claims have been reported if the Applicant is aware of them.  The Applicant further understands that any claim submitted after the completion of this application shall render any terms provided void and Underwriters shall have the right to re-underwrite the Applicant.  In addition, no information provided by this application or along with this application shall be deemed to report a claim.  Such notice should be made as instructed by the policy.

The undersigned authorized person, on behalf of the applicant, attests that to the best of his/her knowledge and belief the statements set forth herein are true. Although the signing of this Application Form does not bind the undersigned to effect insurance, the undersigned agrees that this application and the said statements shall be the basis of the policy of insurance and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy.

The undersigned authorized person on behalf of the applicant declares that the above statements are true, that neither the undersigned person nor the applicant has suppressed or misstated facts and that at the present time the applicant has no reason to anticipate any claims being brought against the applicant or any representative of the applicant or knowledge of any negligent act, error, omission or offense on the applicant's part or any representative of the applicant except as stated herein, and agrees that this Application Form shall be the basis of the contract between the applicant and the Company and shall be deemed a part hereof.

NEW YORK--WARNING: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

FRAUD WARNING: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Signing this form does not bind you to complete the insurance. Coverage will become effective upon approval of the application and issuance of the policy. It is agreed that this form will be the basis of the contract. Should a policy be issued, this form will be attached to and become a part of the policy.

Signature: _____

Title: _Sole Member/President/CEO_____          Date: _11/30/2009_____
          (Must be signed by Owner, Partner or President)                                          Month/Day/Year

**Applicant Firm Name:** NoteWorld LLC, its subsidiaries and affiliate _____